■ Bob Johnson, Appellant, v Lebanese American University et al., Respondents. [922 NYS2d 57]—

Judgment, Supreme Court, New York County (Marylin G. Diamond, J.), entered January 12, 2010, dismissing the complaint, and bringing up for review an order, same court and Justice, entered December 30, 2009, which granted defendants' motion for summary judgment dismissing the complaint, reversed, on the law, without costs, the judgment vacated, and the complaint reinstated.

Plaintiff worked in marketing for defendant university until defendant terminated his employment. At the time of his termination, plaintiff was told that he was being let go due to poor performance. He was further informed that if he signed an agreement entitled "Release & Discharge" (the release) that defendant forwarded to him he would be paid the sum of $4,651.94. The agreement read as follows:

"I, the undersigned Robert Johnson do hereby declare that I have received from the Lebanese American University the sum

of $4,651.94 as an ex-gratia payment in full settlement of any and all claims and entitlements related to my services of whatsoever nature with the above mentioned University up to June 10, 2008.

"I therefore hereby remise, release and completely discharge the Lebanese American University and all its responsible officers of and from all actions or rights that I may ever have against the University in respect of my above mentioned service.

"In witness whereof I have signed this full, final and irrevocable Release and Discharge this day of 6/30/08."

Plaintiff executed the document and collected the stipulated amount. However, he claims that five months later a former coworker at the university told him that she had been informed that defendant Joseph G. Jabbra, the university's president, was uncomfortable with plaintiff's "lifestyle choices." Plaintiff interpreted this alleged statement as a reference to his being gay. He then commenced this action alleging that in terminating him defendants had discriminated against him based on his sexual orientation, in violation of the New York State and New York City Human Rights Laws.

Defendants answered and, apparently before any discovery had been conducted, moved for summary judgment. The sole basis for the motion was the release by which defendants contended plaintiff had waived the discrimination claim. In opposition, plaintiff submitted an affidavit in which he stated that he was unaware of any basis for a discrimination claim against defendants when he signed the release and that he did not understand the document to relinquish any such claims. To the contrary, he stated: "My understanding was that [the $4,651.94 payment] represented back payment that was owed to me by Defendants, including payment for unused vacation and sick time. Therefore, when I signed the release, I thought that by accepting this payment, I was simply giving up my rights to later claim that the Defendants owed me any more unpaid wages. I also did not understand the meaning of the term 'ex-gratia.' " Plaintiff argued that because it referred only to "services," the release should be read narrowly to relinquish only claims for monies owed in exchange for services. At the very least, he asserted, the document was ambiguous as to whether it broadly applied to other rights of employment, such as the right to enforce antidiscrimination laws. Plaintiff also noted in his affidavit that he had not been advised to consult an attorney before executing the release. Finally, plaintiff contended that, by falsely representing to him that he was being discharged for poor per-

formance, defendants fraudulently induced him into signing the release and that the document should be invalidated for that reason.

Supreme Court granted the motion and dismissed the complaint. The court stated: "In releasing the University from all actions or rights he may have against the school with respect to his 'service' thereto, the release was clearly referring to his employment by the University. Indeed, the release is a straightforward, uncomplicated document which apprises a reasonable signatory that all claims arising out of such service are being released and discharged, including employment discrimination claims." The court rejected plaintiff's claim that he had not been advised to consult counsel, finding that no court of this State had held that to be a bar to enforcement of an employment-related release. It further held that plaintiff's fraudulent inducement claim was unavailing because he had not established an issue of fact as to whether he executed the release in specific reliance on the representation that his termination was performance-based.

Under New York State law, the enforceability of releases of employment discrimination claims is generally analyzed the same way any release of claims would be analyzed, that is, as "a contract whose interpretation is governed by principles of contract law" (*Goode v Drew Bldg. Supply*, 266 AD2d 925, 925 [1999] [internal quotation marks and citations omitted]). Pursuant to those principles, language in a contract will be deemed unambiguous only if it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion' " (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002], quoting *Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 355 [1978]). However, as the Court of Appeals has explained: "There is little doubt . . . that [a release's] interpretation and limitation by the parol evidence rule are subject to special rules. These rules are based on a realistic recognition that releases contain standardized, even ritualistic, language and are given in circumstances where the parties are sometimes looking no further than the precise matter in dispute that is being settled. Thus, while it has been held that an unreformed general release will be given its full literal effect where it is directly or circumstantially evident that the purpose is to achieve a truly general settlement, the cases are many in which the release has been avoided with respect to uncontemplated transactions despite the generality of the language in the release form" (*Mangini v McClurg*, 24 NY2d 556, 562 [1969]

[citations omitted]). Indeed, for a release to extend to claims both known and unknown, it must have been both " 'fairly and knowingly made' " (id. at 566, quoting *Farrington v Harlem Sav. Bank*, 280 NY 1, 4 [1939]). This does not necessarily mean that the releasor must show that he or she was induced to execute the release by fraudulent means. Rather, "[t]he requirement of an 'agreement fairly and knowingly made' has been extended . . . to cover other situations where because the releasor has had little time for investigation or deliberation, or because of the existence of overreaching or unfair circumstances, it was deemed inequitable to allow the release to serve as a bar to the claim of the injured party" (id. at 567; *see e.g. Haynes v Garez*, 304 AD2d 714 [2003]; *Starr v Johnsen*, 143 AD2d 130 [1988]).

On their motion for summary judgment, defendants bore the burden of establishing that the release was unambiguous as a matter of law and that there were no material issues of fact regarding whether it precluded the claims asserted by plaintiff in his complaint. Defendants satisfied their initial requirement by submitting the release. However, plaintiff raised a triable issue of fact as to whether a release of discrimination claims was "fairly and knowingly made." He did this by stating that it was his "understanding" that the release was simply an acknowledgment that the $4,651.94 payment that defendants would make upon receipt of the executed document represented everything he was already owed at the time of his termination, and that he had no right to challenge the amount at a later date. Whether plaintiff had a valid basis for such an "understanding" cannot be determined on this record. Indeed, plaintiff does not reveal who or what led him to form this belief. Further, if plaintiff had inquired into the meaning of the term "ex-gratia," he might have realized that, contrary to his "understanding," defendants considered the payment gratuitous. However, it is significant that defendants did not challenge the legitimacy of plaintiff's "understanding" or offer an affidavit by anybody at the university who was involved in the preparation of the release. Accordingly, we adhere to the well-established principle that evidence submitted in opposition to a motion for summary judgment should be accepted as true (*see Pellegrini v Brock*, 65 AD3d 971 [2009]).

Plaintiff further created an issue of fact as to the fairness of the release by alleging that he was told that the reason for his termination was poor performance. Plaintiff did not make out a claim for fraud because he did not allege that he was induced by defendants' representation to sign the release. We find, however,

that the allegation suggests the existence of "overreaching or unfair circumstances," which, if proved, would render enforcement of the release inequitable (*see Mangini*, 24 NY2d at 567). Additionally, a question of fact exists whether it would be fair to enforce the release against plaintiff's discrimination claims when plaintiff was given the take-it-or-leave-it proposition of signing the document or not receiving the payment. Again, we must assume, for purposes of this motion for summary judgment, where we are required to give plaintiff the benefit of all favorable inferences that can be drawn from the evidence, that the amount offered to plaintiff constituted wages and benefits he had already earned. If that is the case, it would certainly constitute "overreaching" for defendants to tie the payment of those wages to plaintiff's executing a release. We note that, because of the constraints placed on plaintiff's ability to collect those alleged wages, it was not unreasonable for him not to look up the definition of the term "ex-gratia."

If plaintiff's version of events is correct, then the scope of the release is not necessarily as broad as defendants contend. Plaintiff maintains that he was paid only what he was already owed, and that he was given no additional benefits that would have constituted consideration for a release of discrimination claims. If that is true, then he could not have been expected to understand that he was relinquishing his right to sue for claims unrelated to pay and benefits. Moreover, the release does not on its face preclude the narrow scope urged by plaintiff. If the parties indeed intended the release to settle payment and benefits issues only, then it makes sense that they used language releasing claims related to the "services" plaintiff provided in exchange for those payments and benefits.

The small amount of consideration paid to plaintiff is also significant and further informs our view that summary judgment was improperly granted. While courts do not ordinarily question the amount of consideration supporting an agreement, it is appropriate to consider whether a relatively small amount of consideration paid to a releasor in exchange for signing a release suggests that the scope of the release is narrower than is urged by the releasee (*see Best v Yutaka*, 90 NY2d 833 [1997]; *Haynes v Garez*, 304 AD2d at 716). We also take note of the precise amount of the payment in this case, which indicates that it may have been chosen to resolve only known, quantifiable claims.

This case differs substantially from *Skluth v United Merchants & Mfrs.* (163 AD2d 104 [1990]), which defendants rely on and which appears to be the most relevant New York State case addressing the enforceability of releases that purport to waive

employment discrimination claims. In *Skluth*, the plaintiff had a contract with his employer, the defendant, which provided that the employer could terminate him upon 90 days' notice. The contract stated that during the 90-day notice period plaintiff would continue to be paid his usual salary and benefits, and for a period of 90 days thereafter he would receive additional severance pay. After the employer terminated the plaintiff, the two parties negotiated additional severance pay not provided for in the contract. According to this Court's recitation of the facts, "[t]his extension of benefits formed the consideration for plaintiff's execution of the release pursuant to which he agreed to 'release and forever discharge [defendant] from all liability of every kind, nature and description' arising out of his employment" (163 AD2d at 105). This Court found that the release unambiguously barred the plaintiff's discrimination claim, and that "no legal authority exists for the proposition that a release must expressly mention a discrimination claim in order to be valid and binding with respect thereto" (*id.* at 107).

Unlike the situation here, the plaintiff in *Skluth* could not credibly argue that the release he executed did not cover discrimination claims. The parties in *Skluth* negotiated a severance package that was more generous than the plaintiff was already entitled to, and it was obvious that the employer's incentive for paying the plaintiff more money was a release of claims of discrimination. Here, by contrast, plaintiff maintains that he tendered the release in exchange for a payment of monies already due and owing, and that it would have been unreasonable for him to relinquish additional rights without additional consideration.

The dissent dismisses plaintiff's "understanding" that the release only barred claims for benefits due and owing to him at the time of his termination by citing cases that hold that a releasor's subjective belief as to what he is releasing is irrelevant. However, the dissent ignores the principle that where there is *objective* evidence that the release was not intended to cover certain claims, the releasor will not be barred from asserting those claims (*see Cahill v Regan*, 5 NY2d 292, 299 [1959]). As discussed above, on this record we cannot resolve the precise scope of the release. Moreover, the dissent disregards well-settled rules of construction by reading the operative words of the document in a vacuum. In interpreting contractual language, a court must " 'consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in

the light of the obligation as a whole and the intention of the parties as manifested thereby' " (*Kass v Kass*, 91 NY2d 554, 566 [1998], quoting *Atwater & Co. v Panama R.R. Co.*, 246 NY 519, 524 [1927]). Here, accepting as true plaintiff's statement that the release was prepared specifically in connection with wages and benefits owed to him at the time of his termination, one can reasonably construe the document as waiving claims related to his earnings, and nothing else.

While the fact that plaintiff was not advised to consult with counsel is not dispositive of the enforceability of the release (*Skluth*, 163 AD2d at 107), defendants' tying of the payment to plaintiff's return of the release certainly had a bearing on plaintiff's opportunity to consult counsel. As Supreme Court recognized, the opportunity to consult counsel is at least a factor to be considered when analyzing the volition with which a party entered into a contract (*see id.*). However, with the payment depending on plaintiff's return of the signed release it can hardly be said, as the court did, that plaintiff had "ample" opportunity to consult an attorney before signing the document.

For the foregoing reasons, we find that issues of fact exist as to whether plaintiff intended to relinquish employment discrimination claims when he executed the release. Accordingly, Supreme Court erred in dismissing the complaint. Concur—Mazzarelli, J.P., Moskowitz, Richter and Manzanet-Daniels, JJ.

Andrias, J., dissents in a memorandum as follows: The issue before us is whether plaintiff's action alleging discriminatory discharge in violation of the City and State Human Rights Laws is barred by the "Release & Discharge" (the release) he executed after his employment with defendant Lebanese American University (LAU) was terminated. While we all agree that defendants satisfied their prima facie burden on the summary judgment motion, the majority finds that plaintiff raised a triable issue of fact as to the scope of the release based on his alleged understanding that he was signing a limited release intended to cover only the issues directly related to his services, such as wage and benefit claims. Because I believe that plaintiff's subjective belief is insufficient to render the terms of the release unambiguous, and that there is no evidence that would establish that plaintiff was deprived of the opportunity to consult with counsel before signing the release, I respectfully dissent.

On June 9, 2008, plaintiff was told that he was being terminated from his position as marketing communication project manager at LAU due to poor job performance. Thereafter,

he was told that if he wished to receive severance pay of $4,651.94, he would have to sign a release. On or about June 27, 2008, LAU's director of operations e-mailed the release to plaintiff for his review and signature. On or about June 30, 2008, plaintiff signed and returned the release, which reads:

"I . . . declare that I have received from [the] University the sum of $4,651.94 as an ex-gratia payment in full settlement of any and all claims and entitlements related to my services of whatsoever nature with the above mentioned University up to June 10, 2008.

"I therefore hereby remise, release and completely discharge [defendant] and all its responsible officers of and from all actions or rights that I may ever have against the University in respect of my above mentioned service."

In November 2008, plaintiff, who is gay, was allegedly told by a former coworker that she heard that he had been fired because defendant Jabbra was unhappy with his "lifestyle choice." Plaintiff commenced this action and defendants moved for summary judgment based on the release.

" '[A] valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties' " (*Skluth v United Merchants & Mfrs.*, 163 AD2d 104, 106 [1990], quoting *Appel v Ford Motor Co.*, 111 AD2d 731, 732 [1985]) and will constitute a complete bar to an action on a claim that falls within its scope (*see Hack v United Capital Corp.*, 247 AD2d 300, 301, 302 [1998]). Like any contract, a release must be "read as a whole to determine its purpose and intent," and extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous (*W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990] ["before looking to evidence of what was in the parties' minds, a court must give due weight to what was in their contract"]; *see also Kass v Kass*, 91 NY2d 554, 566 [1998]). "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion' " (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002], quoting *Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 355 [1978]).

Plaintiff asserts that it was his understanding that the release would cover only claims for additional payment or benefits owed for his services and that he did not intend it to apply to any wrongful termination claims. However, "it is not a prerequisite to the enforceability of a release that the releasor be subjectively aware of the precise claim he or she is releasing" (*Mergler v*

*Crystal Props. Assoc.*, 179 AD2d 177, 180 [1992]). If the language of a contract, including a release, is clear and unambiguous, "effect will be given to the intention of the parties as indicated by the language employed and the fact that one of the parties may have intended something else is irrelevant" (*LeMay v H.W. Keeney, Inc.*, 124 AD2d 1026, 1027 [1986], *lv denied* 69 NY2d 607 [1987]; *see Moore v Kopel*, 237 AD2d 124, 125 [1997] [that one party to an agreement may attach a particular, subjective meaning to a term that differs from the term's plain meaning does not render the agreement ambiguous]).

In *Skluth v United Merchants & Mfrs.* (163 AD2d 104, 105 [1990], *supra*), the plaintiff agreed to " 'release and forever discharge [defendant] from all liability of every kind, nature and description' arising out of his employment subject, in part, to the collection of stated salary payments, his pension rights, and his right to participate in defendant's comprehensive medical plan at his own expense so long as he was not enrolled in any other group medical program."

This Court ruled that the quoted language could not be "reasonably construed as restricting the release to claims concerning salary, medical benefits or other forms of financial compensation, and no legal authority exists for the proposition that a release must expressly mention a discrimination claim in order to be valid and binding with respect thereto" (*id.* at 107). Thus, we held that "[s]ince the agreement herein clearly and unambiguously releases defendant from 'all liability of every kind, nature and description', the instrument operates as a matter of law to release defendant from any and all claims, whether already accrued or which might arise subsequent to the date of execution, including plaintiff's assertion of age discrimination" (*id.*).

The language of the release in this case is comparable to the language used in *Skluth*. By its express terms, the release applies to claims "related to my services *of whatsoever nature*" and to "*all* actions or rights that I may *ever* have against the University *in respect of* my above mentioned service" (emphasis added). There is no language limiting the scope of the release to wage and benefit claims. By executing a release with this broad language, plaintiff released not only the claims that were specifically in dispute at the time the release was executed but also any claims that he may *ever* have against defendants related to his service for LAU. The term "services of whatsoever nature" is broad enough to encompass any aspect of the employer-employee relationship between the parties.

Given the unambiguous language of the release, there is no

need to look for extrinsic evidence of the parties' intent (*see Greenfield v Philles Records*, 98 NY2d at 569). In any event, plaintiff's subjective understanding as to the scope of the release does not constitute objective evidence that the release was not intended to cover all claims arising out of his employment and, contrary to the majority's view, no objective evidence was submitted that would suffice to raise an issue of fact as to whether all the parties intended the release to be of limited scope.

The majority also believes that plaintiff's failure to consult with counsel is a relevant factor and that "it can hardly be said, as the court did, that plaintiff had 'ample' opportunity to consult an attorney before signing the document." However, in *Skluth*, we explained: "The other factor deemed crucial by the Supreme Court, plaintiff's failure to consult with an attorney, also does not preclude enforcement of the release. The court properly found that plaintiff is an educated, experienced businessman with knowledge of release letters such as the one that he was asked to execute. He had ample time to seek legal advice prior to signing the instrument and was, even accepting plaintiff's own version of the facts, not prevented or discouraged from doing so by defendant. There is, certainly, no requirement in the law that consultation with a lawyer must occur in order to render a contractual obligation enforceable, even one relinquishing a discrimination claim, so long as the agreement has been knowingly and voluntarily entered into. Although a party's representation by an attorney is some evidence of the knowledge and volition with which a particular contract was made, the absence of counsel is far less critical than the opportunity to consult counsel" (163 AD2d at 107 [citations omitted]).

Plaintiff, a marketing communication project manager at LAU, was not forced to sign the release on the spot, and he does not aver that he was given an ultimatum by defendants that they would withdraw the compensation offer if he did not sign and return the release by a date certain. Indeed, plaintiff acknowledges that he "had the release for approximately two days before [he] signed it." Thus, there is nothing to show that plaintiff was in any way deprived of the opportunity to consult with counsel or pressured to forgo that right.

Accordingly, I would affirm the judgment dismissing the complaint.