10-1801-cv
*Interpharm, Inc. v. Wells Fargo Bank, N.A.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2010

(Argued: March 2, 2011    Decided: August 26, 2011)

Docket No. 10-1801-cv

INTERPHARM, INC.,

*Plaintiff-Appellant*,

—v.—

WELLS FARGO BANK, NATIONAL ASSOCIATION,

*Defendant-Appellee.*

Before:

JACOBS, *Chief Judge*, LEVAL, RAGGI, *Circuit Judges*.

On appeal from a judgment of the United States District Court for the Southern District of New York (Richard J. Holwell, *Judge*), plaintiff submits that the district court erred in dismissing this action based on releases executed in favor of defendant because the releases were a product of economic duress.

AFFIRMED.

1

MICHAEL DOCKTERMAN, Wildman, Harrold, Allen & Dixon LLP, Chicago, Illinois (Alan D. Halperin, Neal W. Cohen, Halperin Battaglia Raicht, LLP, New York, New York, and John E. Frey, Wildman, Harrold, Allen & Dixon LLP, Chicago, Illinois, *on the brief*), *for* Plaintiff-Appellant.

JEFFREY A. WURST (Robert F. Regan, *on the brief*), Ruskin Moscou Faltischek, P.C., Uniondale, New York, *for* Defendant-Appellee.

REENA RAGGI, *Circuit Judge*:

This action for breach of contract and related tort claims has its origin in a February 9, 2006 Credit and Security Agreement ("Credit Agreement"), wherein defendant Wells Fargo Bank, N.A. agreed <u>inter alia</u> to provide plaintiff Interpharm, Inc. with a revolving line of credit. Interpharm now appeals from a judgment of dismissal entered on May 6, 2010, in the United States District Court for the Southern District of New York (Richard J. Holwell, *Judge*). Interpharm contends that the district court erred in relying on releases executed in favor of Wells Fargo, most recently in a forbearance agreement dated May 14, 2008, to dismiss its claims, <u>see</u> <u>Interpharm, Inc. v. Wells Fargo Bank, N.A.</u>, No. 08 Civ. 11365(RJH), 2010 WL 1257300, at *12 (S.D.N.Y. Mar. 31, 2010), because its complaint pleaded that these releases were induced by economic duress.[1] On <u>de novo</u> review, we reach the same conclusion as the district court: Interpharm failed to plead plausibly that Wells Fargo made

---

[1] The district court dismissed all claims arising before the May 14, 2008 release but not two claims arising thereafter. The parties stipulated to the dismissal of those remaining claims in order to allow a final judgment to be entered and a notice of appeal to be filed.

2

a "wrongful threat," an essential element of economic duress. Rather, the conduct alleged to have caused duress evidences only the exercise of Wells Fargo's legal rights under the parties' original contract and subsequent agreements. To the extent that those rights included Wells Fargo's exercise of "reasonable discretion" in various areas, Interpharm's allegations fail as a matter of law to plead actions exceeding the scope of such discretion.

Accordingly, we affirm the judgment of dismissal.

## I.  **Background**

### A.  The Commercial Transaction Giving Rise to this Lawsuit

On this review of a judgment of dismissal, we accept as true the following facts as to the commercial transaction at issue, which are drawn from Interpharm's complaint as well as from the contracts referenced therein that are integral to the pleading. See Hess v. Cohen & Slamowitz LLP, 637 F.3d 117, 119 (2d Cir. 2011); Chambers v. Time Warner, Inc., 282 F.3d 147, 152-54 (2d Cir. 2002).

#### 1.  The Credit Agreement

In 2006, Interpharm, a manufacturer of generic drugs, sought credit to support the expansion of its business. In the February 2006 Credit Agreement that is the basis for this action, Wells Fargo agreed to provide Interpharm with a revolving line of credit up to $22.5 million through February 10, 2010. Interpharm secured this credit line with various assets, including its accounts receivable, inventory, and equipment.

The amount available to Interpharm at any particular time under the line of credit varied, depending on the values of its eligible inventory and accounts receivable.

3

Specifically, the Credit Agreement indicated that the borrowing base would be calculated based on 50% of Interpharm's eligible inventory and 85% of its eligible accounts receivable, but the agreement also permitted Wells Fargo, in its "reasonable discretion" or "commercially reasonable discretion," both to reduce those percentages and to deem particular receivables or inventory ineligible for credit calculation. Credit Agreement § 1.1 (definitions of: "Accounts Advance Rate"; "Borrowing Base"; "Eligible Accounts"; and "Eligible Inventory").

The Credit Agreement also contained financial covenants and performance standards that Interpharm was required to satisfy. In the event of any default, the Agreement afforded Wells Fargo a range of remedies, including termination of the line of credit, acceleration of Interpharm's obligations to be due and payable forthwith, and liquidation of collateral.

### 2. The First Default and the October Forbearance Agreement

In the third calendar quarter of 2007, a decline in Interpharm's revenue put it in default of the Credit Agreement. Rather than exercise its default remedies, however, Wells Fargo entered into a new agreement with Interpharm on October 26, 2007 ("October Forbearance Agreement"), that partially amended the Credit Agreement, increasing Interpharm's revolving line of credit by $2 million in exchange for additional fees and higher interest rates. As part of the October Forbearance Agreement, Interpharm admitted that it was in default of the Credit Agreement and that it owed Wells Fargo $30,032,630.29, plus interest and costs. Wells Fargo agreed to forbear from invoking its default remedies provided that Interpharm raised additional capital and complied with certain financial requirements,

4

including a covenant that it have a positive net pre-tax income and cash flow for both the month of November 2007 and the quarter ending December 2007. Interpharm alleges that, at the time the October Forbearance Agreement was negotiated, it thought these targets "highly uncertain and unreasonable" and communicated its concerns to Wells Fargo. Compl. ¶¶ 30-31. Wells Fargo purportedly responded by "vaguely propos[ing] to negotiate new financial covenants for the first half of 2008 that would provide Interpharm with the relief it needed to succeed." Id. ¶ 32. Thinking it had "little choice" but to agree to Wells Fargo's terms, Interpharm signed the October Forbearance Agreement. Id. Therein, it agreed to release all claims against Wells Fargo arising prior thereto. The October Forbearance Agreement also contained a merger clause stating that "[t]his Agreement represents the entire agreement between" the parties. Oct. Forbearance Agreement ¶ 24.

### 3. The Second Default and the February Forbearance Agreements

Interpharm did not meet the 2007 financial targets set forth in the October Forbearance Agreement and, in early January 2008, advised Wells Fargo of this default. Wells Fargo responded on January 10 by increasing Interpharm's interest obligations to the default rate and assessing other default penalties. That same month, it advised Interpharm that it "wanted out" of the loan. Compl. ¶ 35. Also in January 2008, Wells Fargo decided to exclude the receivables of four of Interpharm's major wholesale customers from the eligible accounts used to calculate the monies available under the revolving line of credit. According to Interpharm, Wells Fargo explained that the amount of these receivables was imprecise because three of the customers were entitled to "charge back" to Interpharm any

5

difference between the prices they paid for Interpharm products and the prices negotiated with Interpharm by downstream customers such as pharmacy chains.[2] Id. ¶ 37. Interpharm alleges that such a "charge-back" policy was standard practice in the pharmaceutical business and that Wells Fargo's justification was a "pretext" for constricting the credit available to Interpharm. Id. ¶¶ 37-38.

By the end of January 2008, Interpharm's financial condition had so deteriorated that it could no longer pay its suppliers or meet its payroll. Interpharm advised Wells Fargo that, without working capital, it would have to liquidate. Wells Fargo would not advance further funds without a new agreement, which the parties signed on February 1, 2008 ("February Interim Forbearance Agreement"), further amending the Credit Agreement. Therein, Wells Fargo agreed to forbear from exercising its default rights through February 4, 2008. Meanwhile, Interpharm acknowledged that it was in default of both the Credit Agreement and the October Forbearance Agreement; released all claims to date against Wells Fargo; agreed to amend the Credit Agreement's definition of "Eligible Accounts" specifically to exclude receivables from any wholesalers, including the four already excluded by Wells Fargo in January; and promised to retain a chief restructuring officer acceptable to Wells Fargo in its sole discretion, who would prepare and administer Interpharm's operating budget and oversee all credit requests and payments to Wells Fargo.

On February 5, 2008, the parties entered into a longer-term agreement ("February

---

[2] Interpharm does not indicate what, if any, justification Wells Fargo gave for excluding the fourth customer's receivables.

Forbearance Agreement") further amending the Credit Agreement, wherein Wells Fargo agreed not to exercise its default rights against Interpharm through June 30, 2008, and to continue extending credit. In return, Interpharm released all claims against Wells Fargo arising prior to the date of the agreement and agreed to pay additional fees, to furnish more collateral, and to restructure its operations so as to pay down its obligations to Wells Fargo by June 30, 2008, through either refinancing or an asset sale.

Interpharm alleges that it was a "critical premise of the February Forbearance Agreement and the budget incorporated therein . . . that Wells Fargo would continue to include 50% of Eligible Inventory" in the revolving credit line calculation. Id. ¶ 60. Such terms were not included in the February Forbearance Agreement, which did, however, contain a merger clause stating that "[t]his Agreement represents the entire agreement between Wells Fargo" and Interpharm. Feb. Forbearance Agreement ¶ 29.

### 4. The March Forbearance Agreement

On March 6, 2008, Wells Fargo lowered the multiplier on Interpharm's eligible inventory from 50% to 39.6%, "ostensibly based upon the work of a third party vendor sent in by Wells Fargo to evaluate the liquidation value of the inventory." Compl. ¶ 61. Interpharm alleges that Wells Fargo's action was a material breach of the February Forbearance Agreement, and had the practical effect of reducing available credit below the amount Interpharm required to meet its obligations.

In response to Interpharm's protests that it needed still more credit to operate, Wells Fargo proposed, and on March 25, 2008, the parties signed, yet another agreement ("March

7

Forbearance Agreement"). Therein, Wells Fargo reiterated its promise to forbear pursuit of its existing default remedies through June 30, 2008, and temporarily raised the multiplier for credit calculation to 49% of inventory, though reserving the right to impose such "lesser rate" as Wells Fargo, in its "sole discretion," deemed appropriate. Mar. Forbearance Agreement ¶ 14. In return, Interpharm reiterated its default status, agreed to higher fees, and released all claims against Wells Fargo arising prior to the date of the agreement.

>5. The May Forbearance Agreement

Interpharm asserts that but for Wells Fargo's actions, it would likely have been able to secure refinancing to repay its obligations under the Credit Agreement. Instead, it was obliged to sell its assets, entering into purchase agreements in April 2008, scheduled to close in late June of that year. In early May, Interpharm advised Wells Fargo that it could not survive through closing unless Wells Fargo "agreed to abide" by certain unspecified aspects of the Credit Agreement in calculating Interpharm's available credit. Compl. ¶ 92. Wells Fargo conditioned its agreement on a new forbearance agreement signed May 12, 2008 ("May Forbearance Agreement"), wherein Interpharm, for the fifth time, released its claims against Wells Fargo. That is the release relied on by the district court to grant the challenged dismissal:

> By executing this Agreement, the Borrower [i.e., Interpharm] and Guarantor [i.e., an Interpharm entity called Interpharm Holdings, Inc.] hereby waive, release and discharge any and all claims or causes of action, if any, of every kind and nature whatsoever, whether at law or in equity, arising at or prior to the date hereof, which it or they may have against Wells Fargo and/or its officers and employees in connection with the [Credit] Agreement, this Agreement and all documents executed in connection therewith. Borrower

8

also agrees that all waivers, releases and agreements made herein are made in consideration of, and in order to induce Wells Fargo to temporarily forbear the exercise or further exercise of its rights and remedies against the Borrower under the [Credit] Agreement and to induce Wells Fargo to enter into this Agreement.

May Forbearance Agreement ¶ 28.

After completing the sale of substantially all its assets on June 23, 2008, Interpharm paid its obligations to Wells Fargo. Sometime thereafter, Interpharm advised Wells Fargo in writing that it was repudiating all of the 2008 forbearance agreements, which necessarily included their release provisions.

B.     District Court Proceedings

On December 31, 2008, Interpharm filed this action against Wells Fargo, alleging breach of contract, breach of the duty of good faith and fair dealing, tortious interference with business expectations, unjust enrichment, and breach of fiduciary duty. Wells Fargo moved for dismissal citing the release provision in the May Forbearance Agreement. Interpharm opposed the motion on the basis that the releases it executed in favor of Wells Fargo were the product of economic duress. In its complaint, Interpharm specifically alleged that it had entered into the forbearance agreements releasing all prior claims against Wells Fargo "only because Wells Fargo threatened to continue to wrongfully restrict credit that would have been available to Interpharm had Wells Fargo complied in good faith with its contractual obligations." Compl. ¶ 101. This allegedly left Interpharm with no choice but to agree to the terms of the forbearance agreements or file for bankruptcy, which would have made it "impossible to continue in business." Id. ¶ 102.

9

Noting that Interpharm did not dispute that the release provision of the May Forbearance Agreement would bar its claims absent duress, the district court determined that Interpharm's allegations were insufficient as a matter of law to plead two required elements of economic duress: a wrongful threat by Wells Fargo and the overbearing of Interpharm's free will. See Interpharm, Inc. v. Wells Fargo Bank, N.A., 2010 WL 1257300, at *8-10. As to the first element, the district court reviewed Interpharm's allegations and concluded that, "[a]t best," Interpharm's "claim of wrongful conduct is that Wells Fargo exercised its discretion unreasonably" in restricting the monies available to Interpharm through the revolving line of credit. Id. at *9. This was insufficient to support a claim of duress because when a lender is "faced with a borrower in continued default of its financial covenants, there appears to be nothing 'wrongful' in a lender exercising its right to increase its level of security as its borrower becomes less creditworthy." Id. In short, Interpharm's allegations might demonstrate "that the Bank drove a hard bargain" in conditioning further credit on the higher demands of successive forbearance agreements but "not that it did anything unlawful" to convince Interpharm to enter into these agreements. Id.[3]

Accordingly, the district court dismissed Interpharm's claims arising prior to the date of the May 14, 2008 release. Insofar as the district court allowed Interpharm to pursue two claims arising out of post-May 14, 2008 events, the parties stipulated to the voluntary

---

[3] Because we agree that Interpharm's economic duress claim fails for lack of any plausibly alleged wrongful threat, we need not further discuss the sufficiency of its allegations that the threats overbore its free will.

10

dismissal of those claims in order to allow a final judgment to be entered and this appeal to be filed.

## II. Discussion

### A. Standard of Review

We review de novo a judgment of dismissal pursuant to Fed. R. Civ. P. 12(b)(6), assuming all facts alleged within the four corners of the complaint to be true, and drawing all reasonable inferences in plaintiff's favor. See Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany, 615 F.3d 97, 113-14 (2d Cir. 2010). Where, as in this case, certain contracts are integral to the complaint, we also consider those documents in deciding the merits of the motion. See Chambers v. Time Warner, Inc., 282 F.3d at 152-54. While this standard of review favors the plaintiff, it is not so liberal that a "threadbare" recital of the elements of a claim, "supported by mere conclusory statements," can suffice to defeat a motion to dismiss. Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany, 615 F.3d at 114 (brackets and internal quotation marks omitted). A complaint must contain enough "factual content" to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (describing requirement of "facial plausibility"); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

### B. Interpharm's Duress Challenge to Its Release of Claims Against Wells Fargo

Wells Fargo relies on the release provision of the May Forbearance Agreement to support its motion for dismissal; Interpharm defends that motion on the ground that the

11

agreement was procured by economic duress. Under New York law, which both parties agree controls, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V., 17 N.Y.3d 269, ---, slip op. at 7 (2011) (internal quotation marks omitted). An otherwise valid release may, however, be void on several grounds, one of which is its procurement by economic duress. See id. (stating that "signed release shifts the burden of going forward to the plaintiff to show that there has been fraud, duress or some other fact which will be sufficient to void the release" (brackets, ellipsis, and internal quotation marks omitted)).

### 1. The Standard for Establishing Economic Duress

The doctrine of economic duress is grounded in the principle that courts "will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury." VKK Corp. v. NFL, 244 F.3d 114, 122 (2d Cir. 2001) (internal quotation marks omitted). To void a contract on the ground of economic duress, the complaining party must show that its agreement was procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will. See Stewart M. Muller Constr. Co. v. N.Y. Tel. Co., 40 N.Y.2d 955, 956, 390 N.Y.S.2d 817, 817 (1976); accord Sitar v. Sitar, 61 A.D.3d 739, 742, 878 N.Y.S.2d 377, 380 (2d Dep't 2009); see also Kamerman v. Steinberg, 891 F.2d 424, 431 (2d Cir. 1989) ("New York law . . . establishes the following elements of economic duress: (1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." (internal quotation marks omitted)).

12

The principle, however, extends no further than equity demands. Thus, a mere demonstration of financial pressure or unequal bargaining power will not, by itself, establish economic duress. See Boshes v. Williamson, Picket, Gross, Inc., 276 A.D.2d 257, 258, 714 N.Y.S.2d 199, 199 (1st Dep't 2000); Edison Stone Corp. v. 42nd St. Dev. Corp., 145 A.D.2d 249, 256, 538 N.Y.S.2d 249, 253 (1st Dep't 1989); see also VKK Corp. v. NFL, 244 F.3d at 123 (recognizing frequency with which one commercial party to agreement will have "decided economic advantage" over other, and emphasizing that ability of party to disown contract obligations or release on that basis "is reserved for extreme and extraordinary cases"). The law demands threatening conduct that is "wrongful," i.e., outside a party's legal rights. 805 Third Ave. Co. v. M.W. Realty Assocs., 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 780 (1983). Thus, a threat to withhold performance that one is contractually obligated to provide in order to compel the other party to submit to new demands can constitute a wrongful threat. See id.; accord Bechard v. Monty's Bay Recreation, Inc., 35 A.D.3d 1131, 1132, 826 N.Y.S.2d 826, 827 (3d Dep't 2006). But a threat to exercise a legal right in pursuit of those same demands cannot. See 805 Third Ave. Co. v. M.W. Realty Assocs., 58 N.Y.2d at 453, 461 N.Y.S.2d at 781; accord Madey v. Carman, 51 A.D.3d 985, 987, 858 N.Y.S.2d 784, 786 (2d Dep't 2008); Faillace v. Port Auth. of N.Y. & N.J., 130 A.D.2d 34, 42, 517 N.Y.S.2d 941, 946 (1st Dep't 1987). In this respect, "it is axiomatic that [a party] cannot be guilty of economic duress for failing to grant further forbearance when [it] ha[s] no legal duty to do so." MLI Indus. v. N.Y.S. Urban Dev. Corp., 205 A.D.2d 998, 1001, 613 N.Y.S.2d 977, 980 (3d Dep't 1994); accord Davis & Assocs., Inc. v. Health Mgmt. Servs., Inc., 168

13

F. Supp. 2d 109, 114 (S.D.N.Y. 2001).

        2.      <u>Plaintiff's Failure To Allege a Wrongful Threat</u>

        a.      <u>Interpharm's Defaults Preclude It from Accusing Wells Fargo of "Wrongful" Threats in Conditioning Forbearance Agreements on New Demands</u>

These principles readily reveal a critical flaw in Interpharm's pleading of economic duress. Specifically, once Interpharm defaulted on its obligations under the Credit Agreement, as it did in the third quarter of 2007 and again in early 2008, Wells Fargo was no longer obliged to continue providing Interpharm with any credit pursuant to that contract. Rather, Wells Fargo had the legal right at both junctures to terminate the line of credit and to demand immediate repayment of Interpharm's legal obligations, which then totaled more than $30 million. Further, because Wells Fargo was not obliged to forbear the exercise of these legal rights, see <u>MLI Indus. v. N.Y.S. Urban Dev. Corp.</u>, 205 A.D.2d at 1000, 613 N.Y.S.2d at 980, its threat not to forebear exercise of those rights was not wrongful. Interpharm has pleaded no facts supporting a different conclusion.

        b.      <u>Interpharm's Allegations of Economic Duress</u>

        (1)      <u>Conclusory Allegations</u>

In the complaint section charging Wells Fargo with economic duress, Interpharm asserts that it "agreed to the three Forbearance Agreements with Wells Fargo in 2008 only because Wells Fargo threatened to take actions <u>that it was not entitled to take under its contract</u> with Interpharm." Compl. ¶ 100 (emphasis added). Specifically, Interpharm asserts that it "agreed to the 2008 Forbearance Agreements only because Wells Fargo threatened to

continue to wrongfully restrict credit that would have been available to Interpharm had Wells Fargo complied in good faith with its contractual obligations." Id. ¶ 101. Earlier in the complaint, Interpharm had similarly charged Wells Fargo with "squeezing [credit] Availability" in the fall of 2007 "in ways it was not entitled to under the Credit Agreement." Id. ¶ 32; see id. ¶ 27 (describing such conduct as "new pattern" whereby Wells Fargo "would restrict credit in anticipation of or during negotiations with Interpharm in order to increase the financial pressure on Interpharm to agree to Wells Fargo's new terms"). Thereafter, Wells Fargo is alleged to have "refused to abide by its contractual obligations," id. ¶ 70, "wrongfull[ly] restrict[ed] . . . funds to Interpharm," id. ¶ 86, and failed to "abide by certain [unspecified] aspects of the Credit Agreement in calculating the borrowing base," id. ¶ 92.

Such bald allegations that Wells Fargo acted "wrongfully" or contrary to its contract obligations constitute, at best, a "threadbare" and conclusory recital of the wrongful threat element of economic duress. Mortimer Off Shore Servs, Ltd. v. Fed. Republic of Germany, 615 F.3d at 114. These allegations alone are not sufficient to plead plausibly a wrongful threat, particularly where it is undisputed that Interpharm was in default of both the Credit Agreement and the October Forbearance Agreement as of January 1, 2008, and where the Credit Agreement, by its terms, allowed Wells Fargo to terminate Interpharm's line of credit upon default. In these circumstances, to plead a plausible claim of wrongful threat, Interpharm was obliged to allege facts allowing a court to draw the reasonable inference (1) that, even after Interpharm's defaults, Wells Fargo remained bound to perform its obligations under the parties' Credit Agreement; and (2) that Wells Fargo was wrongfully threatening

15

not to perform its still-enforceable obligations in order to compel Interpharm's agreement to the greater demands of the 2008 forbearance agreements. See Ashcroft v. Iqbal, 129 S. Ct. at 1949; Bechard v. Monty's Bay Recreation, Inc., 35 A.D.3d at 1132, 826 N.Y.S.2d at 827.

### (2) Particular Allegations

In its complaint, Interpharm charges Wells Fargo with three violations of its obligations in 2008: (1) the January 10, 2008 decision to assess charges and increase interest rates in response to Interpharm's default under the October Forbearance Agreement; (2) the late January 2008 decision to exclude the receivables of four wholesale customers from the calculation of funds available under the revolving line of credit; and (3) the March 6, 2008 decision to reduce the multiplier applicable to Interpharm's eligible inventory from 50% to 39.6%. Like the district court, we conclude that these allegations cannot, as a matter of law, plausibly support a wrongful threat. The claims effectively reduce to an argument that, even after Interpharm defaulted under the Credit Agreement and the October Forbearance Agreement, Wells Fargo was obliged to continue extending credit without availing itself of any of the enhanced protections provided in the parties' agreements. We hereby conclude that invocation of these legal rights cannot demonstrate a wrongful threat for purposes of claiming economic duress.

### (a) The January 10, 2008 Decision with Respect to Interest Rates and Costs

Interpharm alleges that, after its default under the October Forbearance Agreement, Wells Fargo's January 10, 2008 demand for higher interest rates and charges was

16

"unreasonable and inconsistent with the intentions of the parties when entering into" the October agreement. Compl. ¶ 34. In support, Interpharm asserts that, when the October agreement was signed, it "had told Wells Fargo" that the agreement's 2007 financial targets were unrealistic. Id. In response, Wells Fargo had "vaguely proposed to negotiate new financial covenants for the first half of 2008 that would provide Interpharm with the relief it needed to succeed." Id. ¶ 32; see id. ¶ 34.

Accepting these allegations as true, Interpharm nevertheless fails to plead plausibly that Wells Fargo acted wrongfully. After Interpharm's default under the Credit Agreement, Wells Fargo was under no legal obligation to extend further credit. Rather, the Credit Agreement gave Wells Fargo the legal right to terminate the revolving line of credit and to demand forthwith repayment of all monies loaned. It is in this context that a court must consider Interpharm's pleading that, notwithstanding its view, communicated to Wells Fargo, that the financial covenants in the October Forbearance Agreement were "highly uncertain and unreasonable," id. ¶ 30, it had "little choice" but to sign the agreement in order to secure further financing, id. ¶ 32. If Interpharm had little choice but to agree to the covenants of the October Forbearance Agreement, it was not because Wells Fargo was threatening to withhold performance under its contract with Interpharm, but because Wells Fargo was otherwise unwilling to forbear from its contract right to terminate the line of credit. The former circumstance might evidence a wrongful threat, see 805 Third Ave. Co. v. M.W. Realty Assocs., 58 N.Y.2d at 451, 461 N.Y.S.2d at 780; the latter illustrates only permissible hard bargaining, see Boshes v. Williamson, Picket, Gross, Inc., 276 A.D.2d at 258, 714 N.Y.S.2d

17

at 199; <u>Edison Stone Corp. v. 42nd St. Dev. Corp</u>, 145 A.D.2d at 256, 538 N.Y.S.2d at 253. Moreover, the same conclusion obtains with respect to Wells Fargo's application of contractually authorized higher interest rates and charges after Interpharm's default on the October Forbearance Agreement. Whatever expectations Interpharm may have had from its conversations with Wells Fargo, the October Forbearance Agreement contained a merger clause that precludes Interpharm from maintaining that Wells Fargo had any legal obligation to extend it further credit after default. <u>See</u> <u>Jarecki v. Shung Moo Louie</u>, 95 N.Y.2d 665, 669, 722 N.Y.S.2d 784, 786 (2001) ("The purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing."). In short, because Wells Fargo's response to Interpharm's default under the October Forbearance Agreement did not exceed its contract rights, its decision to apply higher interest rates and charges cannot constitute a wrongful threat. <u>See, e.g.</u>, <u>Madey v. Carman</u>, 51 A.D.3d at 987, 858 N.Y.S.2d at 786.

(b)     <u>The Late January 2008 Decision with Respect to Accounts Receivable</u>

With respect to Wells Fargo's late January 2008 decision to exclude receivables from four of Interpharm's wholesale customers from the calculation of available credit, Interpharm alleges that these customers' receivables were sound collateral, that there was "absolutely no commercially reasonable justification" for excluding them, and that such exclusion was "neither permitted by the contract nor reasonable." Compl. ¶ 39; <u>see</u> <u>id.</u> ¶ 48 (characterizing exclusion of fourth customer's receivables as "capricious"). Insofar as Wells Fargo justified

18

its actions by reference to the "standard" industry practice of allowing wholesale customers to claim "charge-backs," id. ¶ 37, Interpharm argues that Wells Fargo's purported justification was a "pretext," id. ¶ 38, and that its real purpose was to "increase the pressure on Interpharm" in the parties' ongoing negotiations as to the conditions for further forbearance and extensions of credit, id. ¶ 48.

The Credit Agreement belies Interpharm's allegation that the exclusion of wholesale customers' receivables was not "permitted" by the parties' contract. That Agreement plainly afforded Wells Fargo "reasonable discretion" to exclude any accounts receivable from the calculation of the revolving line of credit. Credit Agreement § 1.1 (definition of "Eligible Accounts").

Insofar as Interpharm challenges the reasonableness of Wells Fargo's action, we note that the Credit Agreement does not itself define the phrase "reasonable discretion." The parties have not pointed us to any published decision by a New York court construing this language in the context of a commercial contract, nor have they suggested that extrinsic evidence should guide its construction. Cf. Johnson v. Lebanese Am. Univ., 84 A.D.3d 427, 434, 922 N.Y.S.2d 57, 63 (1st Dep't 2011) (holding that "extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous" (internal quotation marks omitted)). Indeed, Interpharm asserts on appeal that the phrase should be given no special meaning beyond the commonly understood definition of the words. In any number of contexts, reasonable discretion is commonly understood to allow a decision maker to choose from a broad range of choices not conflicting with law or reason. See, e.g., United States v.

19

Perez-Frias, 636 F.3d 39, 42 (2d Cir. 2011) (reviewing criminal sentence for reasonableness under abuse-of-discretion standard, such that sentence will be set aside "only in exceptional case[ ]" where it "cannot be located within the range of permissible decisions" (internal quotation marks omitted)); Vaughn v. Air Line Pilots Ass'n, Int'l, 604 F.3d 703, 709 (2d Cir. 2010) ("A union's actions are arbitrary only if . . . the union's behavior is so far outside a wide range of reasonableness as to be irrational." (internal quotation marks omitted)); Brown v. Greene, 577 F.3d 107, 110 (2d Cir. 2009) ("In assessing whether counsel's performance was objectively reasonable, we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." (internal quotation marks omitted)).

We need not here delineate the precise outer boundaries of reasonable discretion in the context of the Credit Agreement at issue in this case. Cf. United States v. Cavera, 550 F.3d 180, 191 (2d Cir. 2008) (en banc) (discussing obligation "to patrol the boundaries of reasonableness" in sentencing context). We conclude that, as a matter of law, the complaint fails to allege facts sufficient to show that Wells Fargo exceeded the bounds of reasonable discretion when, in late January 2008, it excluded the accounts receivable of four wholesale customers from the calculation of credit it would make available to Interpharm. Even assuming that charge-backs are a customary pharmaceutical industry practice, it would hardly be unreasonable for a lender to view receivables subject to such reductions as a less reliable indicator of anticipated borrower income than receivables not subject to such reductions.

20

The same conclusion obtains with additional force where, as here, the borrower has defaulted, and the lender, which would have been within its legal rights to terminate a line of credit entirely, is considering whether to continue extending credit instead. As the district court aptly observed, "faced with a borrower in continued default of its financial covenants, there appears to nothing 'wrongful' in a lender exercising its right to increase its level of security as its borrower becomes less creditworthy." Interpharm, Inc. v. Wells Fargo Bank, N.A., 2010 WL 1257300, at *9. That includes narrowing the borrowing base to exclude receivables subject to charge-backs. The conclusion is further reinforced by the fact that when the parties entered into the February Interim Forbearance Agreement within two weeks of Wells Fargo's unilateral exclusion of wholesale customers, Interpharm agreed that all wholesale customer accounts would henceforth be excluded from the calculation of its borrowing base.

In sum, we can conceive of no plausible interpretation of "reasonable discretion" under which Wells Fargo's decision to limit the credit it would henceforth make available to a twice-defaulting borrower, while forbearing from invoking more drastic default remedies, would be beyond the scope of such discretion.

(c)     The March 6, 2008 Multiplier Reduction

Interpharm alleges that Wells Fargo's March 6, 2008 reduction of the multiplier applied to Interpharm's eligible inventory to determine available credit "had no commercially reasonable basis in law or fact," Compl. ¶ 61, "was not an exercise of reasonable discretion available to Wells Fargo under the Credit Agreement," id. ¶ 62, and was a "material breach"

21

of the February Forbearance Agreement, id. ¶ 64. In support, Interpharm asserts that it was a "critical premise of the February Forbearance Agreement and the budget incorporated therein" that Wells Fargo would continue to calculate available credit by reference to "50% of Eligible Inventory." Id. ¶ 60. Interpharm submits that the reduction of the multiplier to 39.6% was the result of a third-party vendor's evaluation of the liquidation value of its inventory undertaken "without the input of Interpharm . . . at a time when Wells Fargo had no commercial basis on which to suggest liquidation to any prospective buyer of inventory." Id. ¶ 61. These allegations cannot demonstrate a wrongful threat for a number of reasons.

First, to the extent Interpharm alleges that maintenance of the 50% multiplier was a "critical premise" of the February Forbearance Agreement, no such condition is included in the Agreement itself, which includes a merger clause stating that it "represents the entire agreement" between the parties. Feb. Forbearance Agreement ¶ 29; see Jarecki v. Shung Moo Louie, 95 N.Y.2d at 669, 722 N.Y.S.2d at 786. Thus, any unwritten understanding between the parties would have no bearing on Wells Fargo's express contractual right to reduce the 50% multiplier in its reasonable discretion. Interpharm therefore pleads no plausible breach of the February Forbearance Agreement, much less a wrongful threat indicating economic duress.

Second, just as the Credit Agreement gave Wells Fargo reasonable discretion to exclude certain inventory from the "Eligible Inventory" that would be used to calculate available credit, see Credit Agreement § 1.1 (definition of "Eligible Inventory"), it also gave Wells Fargo reasonable discretion to determine the size of the eligible inventory multiplier,

22

see id. (definition of "Borrowing Base"). Interpharm may disagree both with the valuation that informed the reduced multiplier and with Wells Fargo's basis for considering liquidation, but the facts alleged do not show that the application of a reduced multiplier fell outside the broad range of discretion conferred by the Credit Agreement. Indeed, that Agreement specifically provided Wells Fargo with the power to liquidate collateral as a default remedy, see id. § 7.2(d), and, by March 2008, Interpharm had defaulted on both the Credit Agreement and the October Forbearance Agreement. To be sure, in March 2008, Interpharm was not in default of the February Forbearance Agreement, but Wells Fargo is not charged with wrongful liquidation. It is alleged only to have considered the liquidation value of Interpharm's assets as one factor in deciding the multiplier it would apply to calculate what further credit it would extend this financially troubled debtor. Such conduct – expressly authorized under the Credit Agreement – cannot be the "wrongful threat" required for economic duress.

Finally, Interpharm fails to allege facts indicating that the threat of a reduced multiplier was used to compel Interpharm's agreement to the May Forbearance Agreement, the release provision of which supports the dismissal in this case. As Interpharm acknowledges, in the March Forbearance Agreement, Wells Fargo agreed provisionally to increase the inventory multiplier to 49%. See Compl. at ¶ 79. Interpharm's allegations pertaining to the May Forbearance Agreement make no further mention of a reduced multiplier. Accordingly, not only is there no factual basis for a plausible claim that the March 6, 2008 multiplier reduction constituted a wrongful threat, but also there is no factual

23

basis for connecting that multiplier reduction to the release provision of the May Forbearance Agreement.

### III.    Conclusion

To summarize, while Interpharm alleges that it was effectively destroyed by Wells Fargo's decision to limit the credit it would extend from October 2007 through June 2008, after Interpharm defaulted on the parties' Credit Agreement, Wells Fargo was under no obligation to extend any further credit. To the extent it agreed to do so in a series of forbearance agreements imposing stricter conditions and costs on Interpharm, these demands by a lender otherwise under no obligation to continue extending credit cannot constitute the "wrongful threat" required to establish economic duress under New York law. Nor can a wrongful threat be based on Wells Fargo's exercise of discretion specifically conferred by the Credit Agreement. Accordingly, the releases granted by Interpharm in favor of Wells Fargo in these forbearance agreements are enforceable, and the district court correctly dismissed this action based on the release in the May 12, 2008 Forbearance Agreement.

The judgment of dismissal is AFFIRMED.

24