17-0673-cv
*Spinelli v. National Football League*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2017

Argued: May 1, 2018
Decided: September 11, 2018

No. 17-0673-cv

PAUL SPINELLI, SCOTT BOEHM, PAUL JASIENSKI, GEORGE NEWMAN LOWRANCE,
DAVID STLUKA, DAVID DRAPKIN, THOMAS E. WITTE,

*Plaintiffs-Appellants*,

— v. —

NATIONAL FOOTBALL LEAGUE, NFL VENTURES, L.P., NFL PRODUCTIONS, L.L.C.,
NFL ENTERPRISES, L.L.C., REPLAY PHOTOS, L.L.C., ASSOCIATED PRESS, NFL
PROPERTIES, LLC, ARIZONA CARDINALS HOLDINGS, INC., ATLANTA FALCONS
FOOTBALL CLUB LLC, BALTIMORE RAVENS LIMITED PARTNERSHIP, BUFFALO BILLS,
INC., PANTHERS FOOTBALL, INC., CHICAGO BEARS FOOTBALL CLUB, INC., CINCINNATI
BENGALS, INC., CLEVELAND BROWNS LLC, DALLAS COWBOYS FOOTBALL CLUB, LTD.,
DENVER BRONCOS FOOTBALL CLUB, DETROIT LIONS, INC., GREEN BAY PACKERS, INC.,
HOUSTON NFL HOLDINGS LP, INDIANAPOLIS COLTS, INC., JACKSONVILLEJAGUARS
LTD., KANSAS CITY CHIEFS FOOTBALL CLUB, INC., MIAMI DOLPHINS, LTD.,
MINNESOTA VIKINGS FOOTBALL CLUB LLC, NEW ENGLAND PATRIOTS, LP, NEW
ORLEANS LOUISIANA SAINTS, LLC, NEW YORK FOOTBALL GIANTS, INC., NEW YORK
JETS FOOTBALL CLUB, INC., OAKLAND RAIDERS LP, PHILADELPHIA EAGLES FOOTBALL
CLUB, INC., PITTSBURGH STEELERS SPORTS, INC., SAN DIEGO CHARGERS FOOTBALL
CO., SAN FRANCISCO FORTY NINERS LTD., FOOTBALL NORTHWEST LLC, RAMS

FOOTBALL CO. LLC, BUCCANEERS LIMITED PARTNERSHIP, TENNESSEE FOOTBALL, INC., WASHINGTON FOOTBALL INC.,

*Defendants-Appellees*,

GETTY IMAGES (US), INC.,

*Defendant*.

———————

B e f o r e:

LYNCH and DRONEY, *Circuit Judges*, and SESSIONS, *District Judge.*[*]

Plaintiffs-Appellants are sports photographers who make a living taking and licensing photographs of National Football League events. They seek to recover damages on copyright, contract, and tort theories of liability after Defendants-Appellees allegedly exploited thousands of Plaintiffs' photographs without a license and without compensating Plaintiffs in any way. Plaintiffs also bring an antitrust challenge, alleging that the NFL and Associated Press conspired to restrain trade in the market for commercial licenses of NFL event photographs. The United States District Court for the Southern District of New York (Robert W. Sweet, *J.*) dismissed all of the claims at issue here for failure to state a claim. We AFFIRM IN PART, VACATE IN PART, and REMAND for further proceedings.

———————

[*] Judge William K. Sessions III, of the United States District Court for the District of Vermont, sitting by designation.

KEVIN P. MCCULLOCH (Nathaniel Kleinman, *on the brief*), The McCulloch Law Firm PPLC, New York, NY; William P. Ferranti, The Ferranti Firm LLC, Portland, OR, *for* Plaintiffs-Appellants.

ANDREW L. DEUTSCH (Tammy Y. Duvdevani, *on the brief*), DLA Piper LLP, New York, NY; Jura C. Zibas, Wilson Elser Moskowitz, Edelman & Dicker LLP, New York, NY, *for* Defendants-Appellees Associated Press and Replay Photos, LLC.

JEFFREY A. MISHKIN (Anthony J. Dreyer, Karen Hoffman Lent, Jordan A. Feirman, *on the brief*), Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, *for* Defendants-Appellees National Football League, NFL Ventures, L.P., NFL Productions, L.L.C., NFL Enterprises, L.L.C., NFL Properties, LLC, Arizona Cardinals Holdings, Inc., Atlanta Falcons Football Club LLC, Baltimore Ravens Limited Partnership, Buffalo Bills, Inc., Panthers Football, Inc., Chicago Bears Football Club, Inc., Cincinnati Bengals, Inc., Cleveland Browns LLC, Dallas Cowboys Football Club, Ltd., Denver Broncos Football Club, Detroit Lions, Inc., Green Bay Packers, Inc., Houston NFL Holdings LP, Indianapolis Colts, Inc., JacksonvilleJaguars LTD., Kansas City Chiefs Football Club, Inc., Miami Dolphins, Ltd., Minnesota Vikings Football Club LLC, New England Patriots, LP, New Orleans Louisiana Saints, LLC, New York Football Giants, Inc., New York Jets Football Club, Inc., Oakland Raiders LP, Philadelphia Eagles Football Club, Inc., Pittsburgh Steelers Sports, Inc., San Diego Chargers Football Co., San Francisco Forty Niners LTD., Football Northwest LLC, Rams Football Co. LLC, Buccaneers Limited Partnership, Tennessee Football, Inc., and Washington Football Inc.

_____

GERARD E. LYNCH, *Circuit Judge*:

Plaintiffs-Appellants are seven sports photographers who make a living taking and licensing photographs of NFL events. Defendants-Appellees are the National Football League, various other league entities, and its 32 constituent teams (collectively, "the NFL"); the Associated Press ("AP"), which licenses NFL event photographs for commercial and editorial uses; and Replay Photos, LLC, which sells NFL photographs through an online store. Through this lawsuit, Plaintiffs seek to recover damages on copyright, contract, and tort theories of liability after the NFL and Replay Photos, with AP's permission, allegedly exploited thousands of Plaintiffs' photographs without a license and without compensating Plaintiffs in any way. Plaintiffs also bring an antitrust challenge, alleging that the NFL and AP conspired to restrain trade in the market for commercial licenses of NFL event photographs.

The United States District Court for the Southern District of New York (Robert W. Sweet, *J.*) dismissed all of the claims at issue here for failure to state a

4

claim. For the reasons that follow, we AFFIRM IN PART, VACATE IN PART, and REMAND for further proceedings.

## BACKGROUND

### I. The Relationships Between the Parties

Beginning in 2003, the NFL began to outsource the licensing of its pooled intellectual property (*e.g.*, league and team logos) to outside agencies. From 2007 to 2009, Getty Images (US), Inc., served as the NFL's exclusive licensing agent.[1] From March 2009 to present, the NFL's exclusive licensing agent has been AP.

The agreement that the NFL reached with AP in 2009 (the "2009 AP-NFL agreement") was relatively straightforward. As relevant here, AP became the exclusive agent for and distributor of commercial licenses for photographs that contain NFL intellectual property, and guaranteed the NFL a share of the royalty revenue that it received. AP also granted the NFL a broad complimentary license for "AP-Owned Photos" of NFL events, *i.e.*, photos for which AP owned the

---

[1] Getty was named a defendant in this case, but the district court granted its motion to compel arbitration. No claim against Getty is before us on appeal, and references to "Defendants" in this opinion exclude Getty.

5

copyright. It did not grant such a license for "AP-Contributor Photos," *i.e.*, photos that AP had the right to license, but in which a photographer not employed by AP owned the copyright.

AP and the NFL entered a renewed agreement in April 2012 (the "2012 AP-NFL agreement"). Although the structure of the AP-NFL relationship remained largely the same, the new agreement departed from the prior agreement in at least one significant way: it expanded the complimentary license granted to the NFL to cover photographs owned by non-AP contributing photographers. The new license provision provided as follows:

> AP grants the NFL Entities . . . the right (for no additional payment or fee) to make Editorial use and/or marketing and charitable uses of AP-Owned Photos, Pre-Existing AP-Owned Photos and AP-Contributor Photos . . . . [The] Scope of Use may include . . . NFL or Member Club driven marketing initiatives, NFL or Member Club publishing, catalog or entertainment projects (including, but not limited to magazines, game programs, DVDs, and books whether produced by NFL Entities or in conjunction with third parties) . . . press releases, media guides, game tickets, Member Club season ticket brochures, Member Club wall décor, and the NFL and Member Club websites, profootballhof.com and any other NFL or Member Club owned or controlled website or mobile offerings. . . . AP has or will promptly secure the rights from AP Contributors for the NFL Entities royalty-free use of AP-

Contributor Photos within the Scope of Use as of April 1, 2009 . . . .

C.J.A. 74–75.[2]

Because photographs of NFL events inevitably contain NFL trademarks, commercial exploitation of such photos requires a license from the NFL. In serving as the exclusive licensing agent for the NFL marks, AP became the gateway to the commercial NFL photography market for professional sports photographers like Plaintiffs who wish to shoot NFL events.

Plaintiffs, therefore, entered into "contributor agreements" with AP in order to secure access to NFL events and obtain licenses for the intellectual property contained in the photographs taken at those events. Under their

---

[2] The abbreviation "C.J.A." refers to the parties' Confidential Joint Appendix, which was filed under seal. The materials quoted from or referenced to the C.J.A. in this opinion concern contractual language that is integral to the dispute that is the subject of this opinion. We see no justification for sealing those materials that would outweigh the public's right of access to judicial documents necessary to understand the basis for court rulings, and accordingly, the portions of the C.J.A. referenced in this opinion are, to that extent, unsealed. In addition, it is hereby ORDERED that the parties consult on whether and to what extent other portions of the C.J.A. and Defendants' unredacted briefs should remain under seal. The C.J.A. and the unredacted briefs will be unsealed 28 days after issuance of this opinion absent a properly supported motion to keep specific portions of the materials under seal.

contributor agreements, Plaintiffs agreed to provide their "Best Cut Photos" from each of the events they covered, and AP agreed to use commercially reasonably efforts to accept as many of Plaintiffs' photographs as possible for inclusion in its stock photo database. Plaintiffs retained "all right, title and interest in and to" each of the photographs accepted by AP, as well as the right to sue for infringement, J.A. 923, 925, but granted AP a broad license as follows:

> Photographer hereby provides to AP a perpetual, irrevocable, transferable, worldwide, right and license to reproduce, edit, translate the caption of, prepare derivative works of, publicly perform, publicly display, load into computer memory, cache, store and otherwise use the Final Photos and to transfer or sublicense these rights to other entities. With respect to NFL Event Photos taken at NFL Events for which AP directly or indirectly arranges for Photographer to obtain a credential, the foregoing rights shall be exclusive for so long as the NFL (or one of its affiliates) confers to AP (or one of its affiliates) the exclusive rights to operate as an NFL commercial use licensing agent, and nonexclusive thereafter. With respect to all other Event Photos and the Archival Event Photos, the foregoing rights shall be non-exclusive. AP shall present the Final Photos through AP's image database currently known as "AP Images" (the "AP Images Platform") and other image databases at AP's discretion.

J.A. 923.[3]

In turn, AP agreed to pay royalties for certain uses of Plaintiffs' works. The

provision covering royalties reads as follows:

> In exchange for the license granted in Section 4, AP shall
> provide to Photographer on qualifying Event Photo
> Sales (as defined below), the greater of (a) a royalty
> equal to the Applicable Percentage (as defined in
> Section 5.2) of Net Revenue (as defined below), and (b) a
> royalty equal [to] twenty-five dollars ($25.00) per Final
> Photo (each of (a) and (b), "Royalties"). . . . For purposes
> of this agreement, "Event Photo Sales" shall mean only
> the a la carte sale of licenses for Event Photos through
> AP's online database service, currently known as "AP
> Images." A la carte sales shall mean the sale of licenses
> for individual photos for which a per-image price is
> established. No Royalties or other compensation shall
> be due to Photographer for the downloading of
> "preview" or "thumbnail" or other promotional or
> browse-quality images. For the purposes of this
> Agreement, "Net Revenue" shall mean all cash actually
> collected by AP from the sale of copies of a particular
> Event Photo, less sales commission. . . . It is understood
> that AP may offer the Event Photos for a la carte sale at
> a bulk rate, which may require allocation of revenues
> across photographic images from photographic images
> from various photographers downloaded and/or made
> available to third party licensees. In the event that Event

---

[3] There are some differences among the individual Plaintiffs' contributor
agreements. Because those differences are largely immaterial, we principally
quote from only one such agreement, but note differences among the agreements
when relevant.

Photo(s) are licensed on an a la carte basis with other photographs at a bulk rate, the net revenue received by AP shall be apportioned on an equal pro-rata basis across all photos included in the a la carte bulk rate, for purposes of determining the applicable Royalties for each Event Photo. AP shall not use Photographer's Event Photos in any discounted subscription plan it sells to its customers. Photographer shall be entitled to no compensation for licensing or use of the Event Photos in any of AP's own publicity or advertising materials.

. . . [T]he "Applicable Percentage" shall mean (a) forty percent (40%) for NFL Event Photos taken by Photographer that are licensed for commercial use by AP (or its affiliates) pursuant to Section 4, (b) fifty percent (50%) for NFL Event Photos taken by Photographer that are licensed for editorial use by AP (or its affiliates) pursuant to Section 4, (c) forty percent (40%) for Event Photos (excluding NFL Event Photos) and Archival Event Photos that are licensed for commercial use by AP (or its affiliates) pursuant to Section 4, and (d) fifty percent (50%) for Event Photos (excluding NFL Event Photos) and Archival Event Photos that are licensed for editorial use by AP (or its affiliates) pursuant to Section 4.

J.A. 923–24. Certain of the contributor agreements do not include a minimum payment amount on Event Photo Sales, making the royalty simply a percentage of the cash collected on qualifying sales.

## II.     The Dispute Over Complimentary Licenses

10

Ever since Plaintiffs executed their contributor agreements, things have not gone as Plaintiffs expected. The NFL has made widespread use of Plaintiffs' photographs — publishing them in NFL promotional and editorial materials, licensing and selling them through online photo stores, displaying them on NFL websites, and even turning a photograph of quarterback Aaron Rodgers into a multi-story poster promoting Super Bowl XLV — all without paying anything to Plaintiffs. According to Plaintiffs, the NFL has committed thousands of individual acts of copyright infringement.

The NFL has long demonstrated interest in using Plaintiffs' photographs for free. In 2007, Getty, hoping to secure an extension of its existing contract with the NFL, requested that Plaintiffs allow Getty to grant "trial" licenses that would allow the NFL to make certain complementary uses of photographs from the 2007-2008 football season for a three-month period. Plaintiffs agreed to those short-term trial licenses, but later rejected Getty's request that the licenses be expanded and extended.

Given their experience with Getty, Plaintiffs raised the issue of NFL access to contributor photos with AP after AP signed its 2009 contract with the NFL. Before Plaintiffs signed their contributor agreements, AP represented that its

11

agreement with the NFL "did not include a complimentary license to use contributor photos and thus the NFL was required, like any other customer, to purchase separate licenses in order to obtain rights to use contributor photos." J.A. 112. Plaintiffs offered to allow the NFL to make complimentary use of their photos in exchange for additional consideration from AP, but AP was uninterested in such an arrangement. It explained that it "did not want or require any exception to [the] minimum royalty requirement [in the contributor agreements] because it intended to charge the NFL for any use of contributor photographs in order to offset the complimentary use of AP's wholly-owned photos that AP already had agreed to." J.A. 113.

Relying on those representations, and pressured by AP's threats that if they didn't sign the agreement as-is they'd lose access to all 2009 NFL events, five of the Plaintiffs signed contributor agreements in August 2009. The other two Plaintiffs signed contributor agreements in 2011 and 2012.

In January 2012, having become aware that the NFL was making extensive use of their photos without paying any royalties, Plaintiffs contacted the NFL. The NFL responded that their 2009 contract with AP included an express license permitting the NFL to make complimentary use of any NFL-related photos

12

licensed by AP, including Plaintiffs'. (As the actual text of the 2009 AP-NFL agreement makes clear, that representation was false.)

Plaintiffs then contacted AP, which explained that the NFL was insisting on a complimentary license to all contributor content. AP denied that it had issued such a license. What's more, AP told Plaintiffs that negotiations with the NFL over renewal of the agreement between the NFL and AP were being held up by the fact that AP did not have authority under the contributor agreements to issue complimentary licenses for contributing photographers' works. For that reason, AP requested that Plaintiffs agree to "contract amendments that would permit AP to grant the NFL limited but complimentary uses of Plaintiffs' photo collections," and requested Plaintiffs' input on the scope of a license to which all parties could agree. J.A. 122. In their discussions with AP, Plaintiffs made clear that they considered NFL's current uses to be infringing; AP did not express a different view, and even "confirmed that all of the NFL's uses of Plaintiffs' photos from April 2009 until April 2012 were unlicensed." J.A. 124.

Unbeknownst to Plaintiffs, however, AP had already entered into the 2012 AP-NFL agreement before any of the discussions with Plaintiffs over contract amendments took place. In other words, AP had already granted a

13

complimentary license to the NFL before it sought amendments to its contracts with Plaintiffs that would permit AP to do so. Eventually, AP told Plaintiffs that complimentary usage rights for contributor photos "were built into the [2012 AP-NFL agreement] and were a non-negotiable mandatory element." J.A. 124. Plaintiffs were told they could either accept amendments to their contributor agreements so as to permit AP to grant complimentary licenses to the NFL, or they could opt out of their agreements and no longer shoot NFL events.

Plaintiffs did not accede to AP's demands. And though AP's "opt in or opt out" offer might suggest that the contributor agreements in place did not allow complimentary licenses, the NFL allegedly continues to use Plaintiffs' photographs to this day without paying royalties. J.A. 124.

A similar issue arose with respect to Replay Photos, which, together with AP, sells copies of NFL-related photographs through an online "NFL Photo Store," located at www.nflphotostore.nfl.com. Soon after Plaintiffs approached AP in 2012 about the NFL's alleged infringement, AP requested that Plaintiffs agree to a substantially reduced royalty rate for licenses to Replay. AP presented Plaintiffs with a proposed amendment to their contributor agreements setting forth the reduced royalty rate in November 2012. Plaintiffs uniformly rejected it.

14

Replay went ahead and sold posters, canvases, and other copies of Plaintiffs' photographs anyway, and neither Replay nor AP has ever paid anything to Plaintiffs in return.

## III.    Procedural History

Plaintiffs filed this lawsuit in October 2013 and amended their pleading after Defendants moved to dismiss. Defendants renewed their motions; the district court granted them, but gave Plaintiffs the opportunity to replead. Plaintiffs then filed a second amended complaint, asserting the claims that are relevant here: copyright infringement, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, unconscionability, fraud, and violation of sections 1 and 3 of the Sherman Act. Defendants again moved to dismiss. The district court, largely relying on the reasoning set forth in its decision dismissing the first amended complaint, granted the motions as to all of Plaintiffs' claims in the second amended complaint except the claim of

unconscionability; it later reconsidered and dismissed the unconscionability

claim as well. This appeal followed.

## DISCUSSION

We review de novo a district court's decision to grant a motion under

Federal Rule of Civil Procedure 12(b)(6). *City of Pontiac Gen. Employees' Ret. Sys. v.*

*MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011).

On appeal, Plaintiffs argue that the district court erred in dismissing their

claims for copyright infringement, breach of implied covenant of good faith and

fair dealing, breach of fiduciary duty, unconscionability, fraud, and violation of

the antitrust laws. We consider each in turn.

## I.      Copyright Infringement

Plaintiffs first challenge the district court's dismissal of their various

copyright infringement claims.

To state a claim for copyright infringement, a plaintiff must allege "both (1)

ownership of a valid copyright and (2) infringement of the copyright by the

defendant." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir. 2001). A

valid license to use the copyrighted work "immunizes the licensee from a charge

16

of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor." *Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007). The existence of a license is an affirmative defense, placing upon the party claiming a license "the burden of coming forward with evidence" of one. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995). By contrast, "[w]here only the scope of the license is at issue," it is the copyright owner's burden to show that the defendant's use of a work was unauthorized. *Id.* Disputes involving the scope of a license present courts with a question of contract. *Id.*

A person "infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (internal citation omitted). Without a showing of a direct copyright infringement, secondary liability cannot be maintained. *Id.* at 930; *Faulkner v. Nat'l Geographic Enterprises Inc.*, 409 F.3d 26, 40 (2d Cir. 2005).

Here, Defendants do not dispute that Plaintiffs have valid copyrights in the photographs in question or that, subject to a few exceptions discussed below, the

17

NFL and Replay used Plaintiffs' photographs in ways that, absent a valid license, would be considered infringing.[4] Therefore, the principal dispute is over Defendants' various license defenses. Plaintiffs claim that Defendants are liable for copyright infringement on the theories that (i) AP was barred under *Davis v. Blige*, 505 F.3d at 104, from granting the NFL a retroactive license for the 2009–2012 period (*i.e.,* before the 2012 AP-NFL agreement expressly granted the NFL a sublicense to Plaintiffs' photographs); (ii) AP had no authority under the contributor agreements to grant complimentary licenses for the 2012–2015 period (*i.e*, the period during which the 2012 AP-NFL agreement was in place); and (iii) in any event, certain of Defendants' uses of Plaintiffs' images were not covered by the licenses purportedly given and received. We agree with Plaintiffs' contentions in part.

### A.     2009–2012 Uses

---

[4] Although AP argues that dismissal of the vicarious and contributory infringement claims against it should be affirmed because Plaintiffs do not plausibly plead direct copyright infringement by the NFL and Replay Photos, AP does not contend that even if Plaintiffs plausibly allege direct infringement against the other Defendants, the complaint nonetheless fails to state a claim for secondary liability against AP. For this reason, insofar as we determine that the direct infringement claims are plausibly alleged, we vacate the dismissal of the secondary liability claims against AP.

18

The only express license purporting to cover the NFL's uses of Plaintiffs' photographs before the 2012 AP-NFL agreement was reached is contained in that very agreement. Plaintiffs argue that our decision in *Davis v. Blige* barred AP from granting such a retroactive license, defeating any license defense that the NFL might have for the 2009–2012 period.

In *Davis*, plaintiff Sharice Davis claimed that she and a third party, Bruce Chambliss, were co-authors of compositions used in two songs recorded by Mary J. Blige. 505 F.3d at 94. Davis sued Blige, Bruce Miller, who co-wrote the two allegedly infringing songs, and others involved in the songs' production. *Id.* While litigation was ongoing, Chambliss transferred his ownership interest in the disputed compositions to Miller "effective as of the date" that the compositions were created. *Id.* at 96. The defendants then moved for summary judgment on the ground that the "written transfer agreements conveyed the copyrights [to Miller] retroactively," and because a copyright holder cannot sue a co-owner for infringement, Davis's suit was "barred against [the new owner Miller] and those to whom [he] had licensed the disputed compositions (including Blige and the other defendants)." *Id.* at 96–97.

The district court agreed, but this Court did not. Our decision vacating the

19

grant of summary judgment rested on two key principles: that the "right to prosecute an accrued cause of action for infringement is . . . an incident of copyright ownership," and that a co-owner "may not convey more than he owns." *Id.* at 99. One co-owner's retroactive license or assignment to another party was thus invalid because it "would — if given legal effect — erase the unauthorized use from history with the result that [the other] co-owner's right to sue for infringement, which accrues when the infringement first occurs, is extinguished." *Id.* at 103.

The status of the parties here may differ slightly from those in *Davis*, but the reasoning of *Davis* leads inescapably to the same conclusion. Before the 2012 AP-NFL agreement was executed, Plaintiffs had the right to sue the NFL for copyright infringement, and if the retroactive license AP granted in 2012 were effective, AP would have extinguished that right. Doing so was impermissible, irrespective of whether AP had the authority to issue a prospective license to the NFL starting in 2009. *See id.* at 100 (recognizing that a copyright owner, like Chambliss, "may grant a *non-exclusive* license to use the work unilaterally," which would permit uses that a co-owner may not have approved of and would prevent the co-owner from claiming infringement, but holding that the existence

20

of that authority does not allow the copyright owner to achieve the same result retroactively).

As an alternative to their failed retroactive-license argument, Defendants contend that AP impliedly licensed the NFL's 2009–2012 uses through its conduct, making reliance on the express retroactive license unnecessary. That argument comes up short as well.[5]

The argument fails at the threshold because Defendants did not advance their implied-license theory before the district court. The "well-established general rule [is] that an appellate court will not consider an issue raised for the first time on appeal." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 615 (2d Cir. 2016) (internal quotation marks omitted). Although we have "discretion to entertain new arguments where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding, the circumstances normally do not militate in favor of an exercise of discretion to address new arguments on appeal where those arguments were available to the parties below and they proffer no reason for their failure to raise

---

[5] Even if Defendants' implied-license defense were to succeed, Defendants would still need to confront Plaintiffs' argument, discussed in detail below, that the contributor agreements barred AP from issuing any complimentary licenses.

the arguments below." *Id.* (internal quotation marks and citations omitted).

Defendants urge us to exercise our discretion here, but fail to explain why they raise their new theory for the first time on appeal, even though the license issue was extensively briefed below, and the new theory concerns an affirmative defense, which Defendants have had the burden of raising since the beginning of this suit. Moreover, the implied-license theory inherently turns on the specific facts of AP's behavior, making it a poor candidate for appellate review in the first instance.

Even if it were properly raised, we would find that Defendants' argument fails as a basis for dismissal of Plaintiffs' claims at the pleading stage. Because the existence of a license is an affirmative defense, *Bourne*, 68 F.3d at 631, it is a permissible basis for dismissal only "where the facts necessary to establish the defense are evident on the face of the complaint," *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013). To root the defense in the complaint, Defendants rely on Plaintiffs' allegations that AP "allowed" the NFL to use Plaintiffs' photographs, which they argue are "legally equivalent to an admission that AP exercised its broad right to sublicense under the Contributor Agreements . . . from 2009 onwards." AP Brief 27–28; *see also* NFL Brief 18. But Defendants omit the

22

oppositional clause from Plaintiffs' allegations: "[d]espite the *lack of any license* to use Plaintiffs' photos, the NFL did use (and AP did allow the NFL to use) Plaintiffs' photos extensively [between 2009 and 2012] and did so with AP's full knowledge." J.A. 121 (emphasis added).

Other allegations are even more plainly inconsistent with the notion that, starting in 2009, AP had already impliedly licensed the NFL to use Plaintiffs' photographs. For instance, in 2012, Plaintiffs contacted the NFL about the alleged infringing uses, and the NFL falsely told them that the 2009 AP-NFL agreement "included an express license that allowed complimentary use of" Plaintiffs' photographs. J.A. 122. Shortly thereafter, AP told Plaintiffs that the NFL, in response to Plaintiffs' inquiries, "was insisting on a license to use AP's contributor content on a complimentary basis," and the fact that AP "did not [yet] have the authority to grant such a license" was holding up AP's negotiations with the NFL. J.A. 122. When Plaintiffs resisted, AP represented that the 2012 AP-NFL agreement required that AP allow the NFL to use contributor content for free, and that if Plaintiffs did not agree to allow such complimentary use, they should not sign AP's proposed amendments to the contributor agreements.

These allegations plausibly support an inference that before the 2012 AP-NFL agreement was signed, AP had *not* granted the NFL a complimentary license to Plaintiffs' works, and the NFL knew it. In effect, the complaint plausibly alleges that Defendants' claim of an implied license is simply a post-hoc rationalization meant to excuse the NFL's infringing uses should the 2012 retroactive license be deemed invalid. We thus cannot conclude that AP's alleged failure to act on the NFL's infringing uses — particularly where AP had no authority under the contributor agreements to pursue infringement claims — means that, as a matter of law, AP gave the NFL an implied license.

Accordingly, we vacate the dismissal of Plaintiffs' infringement claims against the NFL and AP insofar as they concern the NFL's infringing uses during the 2009–2012 period.

B.     2012–2015 Uses

Once the 2012 AP-NFL agreement expressly authorized the NFL to use contributor photographs without paying royalties, the assessment of the NFL's alleged infringement changes in Defendant's. Plaintiffs nevertheless contend that the complimentary license was invalid because AP was not permitted to grant such a license under the terms of the contributor agreements.

24

Under New York law, "if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (internal quotation marks omitted). But if "the intent of the parties can[not] be ascertained from the face of their agreement," the contract is ambiguous and its interpretation presents a question of fact. *Id.* (internal quotation marks omitted).

The parties disagree about the correct interpretation of the contributor agreements. Defendants argue that the agreements require payment of royalties only on "qualifying Event Photo Sales," which are defined as "a la carte sale[s] of licenses for Event Photos through AP's online database service"; "a la carte sales," in turn, "mean the sale[s] of licenses for individual photos for which a per-image price is established."[6] J.A. 923. Because the agreements define "sales" by reference to an established "per-image price," and because the AP gave Plaintiffs photographs away for free, the complimentary licenses were not "qualifying

---

[6] It is possible to license photos from the AP image library at a "bulk rate," but that, in effect, just means the per-image prices is set differently, and royalties are determined based on a pro-rata share of the revenue received for "all photos included in the a la carte bulk rate" set. J.A. 923–24.

25

Event Photo Sales" triggering a royalty obligation. Therefore, Defendants continue, because the "Event Photo Sales" clause did not require a royalty payment, we are left with the broad licenses that Plaintiffs granted to AP, which do not limit AP's ability to issue complimentary licenses to use Plaintiffs' works.

If those were the only two contract terms in play, we might agree with Defendants. But we must give "effect and meaning . . . to every term of [a] contract" and strive "to harmonize all of its terms." *India.Com, Inc. v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005) (brackets omitted); *see also Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) ("[T]he entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency."). Interpretations "that render provisions of a contract superfluous" are particularly disfavored. *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002).

Defendants' interpretation would do just that. The contributor agreements recognize two exceptions to AP's obligation to pay royalties that would be superfluous if AP could avoid all royalty obligations to Plaintiffs so long as it does not sell Plaintiffs' photographs on a per-image basis. One exception provides that Plaintiffs are "entitled to no compensation for licensing or use of

26

the Event Photos in any of AP's own publicity or advertising materials." J.A. 924. The other provides that no royalties are due "for the downloading of 'preview' or 'thumbnail' or other promotional or browse-quality images." J.A. 923. Neither AP's own use of photos in advertising nor website visitors' downloading of thumbnail or preview photographs would seem to ever involve the sale of Plaintiffs' photos, making the two clauses unnecessary exceptions to royalty requirements that, under Defendants' interpretation, would already not apply.

Beyond making it challenging to harmonize the various terms of the contributor agreements, Defendants' interpretation is also difficult to reconcile with the overall structure of the agreement, under which Plaintiffs grant AP broad rights in their photographs so that AP can license the photographs to third parties for the mutual benefit of both AP and the photographers. Yet, Defendants' interpretation would permit AP to license *all* of Plaintiffs' photographs to *anyone*, not just the NFL, and avoid paying royalties to Plaintiffs, so long as the third party compensated AP on something other than a per-image basis. This seems manifestly at odds with what the parties intended. *See Kass v. Kass*, 91 N.Y.2d 554, 566 (1998) ("[C]ourts should examine the entire contract and consider the relation of the parties and the circumstances under which it was

27

executed. Particular words should be considered, not as if isolated from the context, but in [] light of the obligation as a whole and the intention of the parties as manifested thereby.") (internal quotation marks omitted).

"Complimentary" license, moreover, is a misnomer. AP certainly benefitted financially from the relationship it had with the NFL, and according to the complaint, the NFL insisted on an unlimited license to use contributor photographs as a non-negotiable term of the 2012 AP-NFL agreement. That license was only complimentary in the sense that the NFL did not pay each and every time it used one of Plaintiffs' photographs. But in the integrated negotiation over the terms of its relationship with the NFL, AP did receive value in return for the license it granted, and its interpretation of the contributor agreements simply allowed it to avoid sharing the wealth with Plaintiffs.

For these reasons, we find the contract ambiguous and recognize a plausible interpretation under which the "qualifying Event Photo Sales" provision not only imposes a royalty obligation on AP, but also limits the ways in which AP can sublicense Plaintiffs' photographs to third parties. And once that ambiguity is recognized, allowing extrinsic evidence to be used "to ascertain the meaning intended by the parties during the formation of the contract," *Alexander*

*& Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998), the case for Plaintiffs' interpretation is even stronger. As Plaintiffs' tell it, the issue of complimentary licenses came up during contract negotiations, and Plaintiffs even offered to allow for such licenses in exchange for additional consideration. AP rejected that offer, explaining that it "did not want or require any exception to [the contributor agreements'] minimum royalty requirement because it intended to charge the NFL for any use of contributor photographs in order to offset the complimentary use of AP's wholly-owned photos that AP already had agreed to." J.A. 113. If a fact-finder ultimately credits (as we must for purposes of a motion to dismiss) Plaintiffs' assertions that Plaintiffs and AP specifically negotiated over Plaintiffs' willingness to grant the NFL a complimentary license for their photographs, and that Plaintiffs rejected the proposal, Defendants' technical interpretation of contract terms that do not directly address the issue of complimentary licenses would be difficult to sustain.

Discovery and trial will shine greater light on whether the extrinsic evidence actually weighs in Plaintiffs' favor, but at this stage of the case, Plaintiffs have plausibly alleged that AP's complimentary license to the NFL was not permitted by the contributor agreements.

It is a separate question, however, whether AP simply violated a contractual promise to pay royalties (a claim for breach of contract) or whether its complimentary license to NFL exceeded the scope of its sublicensing authority (a claim for copyright infringement). If the former, AP would be liable for breach of contract, but the NFL's license would be valid and the NFL would not be liable for copyright infringement. If the latter, the complimentary license itself would be invalid, and Plaintiffs would have a claim for copyright infringement against AP for impermissibly distributing Plaintiffs' photographs and against the NFL for its various displays and reproductions of the photographs. *See* 17 U.S.C. § 106.

Typically, a copyright owner who licenses his work to another "waives his right to sue the licensee for copyright infringement." *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998). But that rule holds true only where the defendant licensee "uses the copyright as agreed with the licensor." *Davis*, 505 F.3d at 100; *see also* 3 Nimmer on Copyright § 10.15 (2018) ("More generally, when a license is limited in scope, exploitation of the copyrighted work outside the specific limits constitutes infringement.").

For example, we have held that where an agreement permitted the licensee to distribute a computer program on CD-ROMs and required the licensee to pay

30

the licensor $1,000 for each new CD-ROM release and $1 dollar for each copy sold, the licensee's failure to pay the applicable royalties on its CD-ROM sales constituted a breach of contract, not copyright infringement. *Graham*, 144 F.3d at 235–36. By contrast, where an agreement licensed CBS's use of a journalist's videos and photographs in its own programming, but did not allow CBS to sublicense the journalist's materials, CBS's sublicenses to other companies exposed CBS to liability for copyright infringement. *Fioranelli v. CBS Broad. Inc.*, 232 F. Supp. 3d 531, 537 (S.D.N.Y. 2017); *see also Kamakazi Music Corp. v. Robbins Music Corp.*, 684 F.2d 228, 230 (2d Cir. 1982) (claim was for copyright infringement, not breach of contract, where defendant published sheet music one month after license to publish expired); *Gilliam v. Am. Broad. Companies, Inc.*, 538 F.2d 14, 21 (2d Cir. 1976) (same where defendant made revisions to Monty Python television program, and thus script, where license permitted script revisions only if approved by Monty Python); *Leutwyler v. Royal Hashemite Court of Jordan*, 184 F. Supp. 2d 303, 307 (S.D.N.Y. 2001) (same where defendant published photographs outside the territory permitted by the license agreement).

The question here is more difficult than in the cases above because Plaintiffs' complaint is that they did not receive royalties for the NFL's use of

31

their photographs (typically, a claim sounding in contract), but the interpretation of the contributor agreements that favors Plaintiffs provides not that the complimentary license to the NFL was a qualifying "Event Photo Sale" triggering the agreements' royalty provisions, but rather that AP was prohibited from sublicensing Plaintiffs' photographs in ways that would not qualify as "Event Photo Sales." In other words, if the ambiguous contributor agreements mean what Plaintiffs say, then the *license* Plaintiffs gave to AP does not permit the complimentary sublicense that AP gave to the NFL. Because Plaintiffs are claiming that AP acted outside the scope of its license, they properly claim copyright infringement, not breach of contract.[7]

Similarly, if the sublicense AP issued to the NFL is invalid, Plaintiffs have alleged a viable copyright claim against the NFL. It may seem unfair to hold a

---

[7] We in no way suggest that a plaintiff can proceed on a copyright infringement claim simply by repackaging a claim for royalties as a claim that the alleged infringer exceeded the scope of a licensing agreement. In most cases, a sale or sublicense triggers a clearly applicable royalty obligation in a licensing agreement, and the remedy is a contractual one for payment of the specific royalty amount that the agreement provides. That is not the case here. AP gave the NFL unfettered access to all of Plaintiffs' photographs, and the contributor agreements, which detail only how royalties are calculated for transactions for which a "per-image price" is established, J.A. 923, do not spell out what Plaintiffs would be owed if breach of contract damages were awarded.

32

sublicensee liable for copyright infringement for using a work for which the sublicensee thought it had received a valid license. But it is without question that the sublicensor "may not convey more than he owns," *Davis*, 505 F.3d at 99, and if a sublicensor has no right to issue a particular license, the sublicensee cannot acquire rights in copyrighted works simply because the sublicensor did so anyway. *See Gilliam*, 538 F.2d at 21 ("If the broadcast of an edited version of the Monty Python program infringed the group's copyright in the script, [sublicensee] ABC may obtain no solace from the fact that editing was permitted in the agreements between [sublicensees and the sublicensor]. . . . Since a grantor may not convey greater rights than it owns, [the sublicensor's] permission to allow [ABC] to edit appears to have been a nullity.").[8]

Accordingly, the district court erred in dismissing the infringement claims relating to the NFL's 2012–2015 uses.

### C. Other Uses

A few other claims of infringement require resolution.

---

[8]A sublicensor in AP's position may be secondarily (and thus jointly) liable for the sublicensee's infringing uses, however, and the sublicensee may have contractual claims against the sublicensor as well. Such potential claims might allow the NFL to limit or obtain compensation for any recovery by Plaintiffs against it.

First, Plaintiffs argue that the district court erred in dismissing their infringement claims relating to online photo sales by Replay. According to Plaintiffs, AP requested that Plaintiffs agree to license those sales at a reduced royalty rate, and when Plaintiffs declined, Replay nevertheless sold Plaintiffs' works without permission.

Defendants' principal response is that Replay obtained a "sublicense by AP" that was "broad enough to include Replay's use of Plaintiffs' photos." Br. for Defendants-Appellees The Associated Press and Replay Photos, LLC ("AP Br.") 39. That argument fails not only because, as we have held above, Plaintiffs have plausibly alleged that AP had no authority to grant complimentary licenses in the first place, but also because the agreement purportedly containing the "sublicense by AP" does not, in fact, allow for Replay's complimentary use of Plaintiffs' photographs. AP's agreement with Replay grants Replay "a license (regarding the photographs owned by AP) and a sublicense (regarding the photographs licensed by AP from the [NFL teams]) to market, display and sell the AP Photographs during the Term as part of Licensed Products offered for sale by Replay." C.J.A. 5. The separately listed definition of "AP Photographs," in turn, provides that

34

"AP Photographs" means all photographs provided by AP to REPLAY for the purpose of creating Licensed Products to be offered for sale on the NFL Photo Store or a Team Photo Store. "AP Photographs" include those photographs for which AP owns the copyright and possesses the photograph artifact, as well as those photographs for which [an NFL team] owns the copyright and possesses the photograph artifact and which are licensed to AP under a written license agreement between AP and the applicable [NFL team].

C.J.A. 2.

Under the plain language of the agreement, AP granted Replay a license for two types of photographs: those owned by AP and those owned by an NFL team. Because AP did not own the copyrights in Plaintiffs' photographs at issue here, Replay's license defense fails.

The NFL alternatively argues that it cannot be held secondarily liable for Replay's infringement because the complaint asserts no secondary liability claims against the NFL and does not allege that the NFL is involved in the operation of the NFL Photo Store.

The NFL is correct that the complaint includes specific causes of action for "vicarious copyright infringement" and "contributory copyright infringement," which are asserted only against AP, and that the cause of action for "copyright

35

infringement" alleges only that AP "infringed Plaintiffs' copyrights by offering copies of Plaintiffs' photos for sale through its 'NFL Photo Store' that it operates jointly with Defendant Replay Photos." J.A. 152–54. Elsewhere in the complaint, however, Plaintiffs allege that the NFL has "earned substantial revenue through . . . licensing or selling (*including through the NFL Photo Store and Replay Photos*) copies of photographs owned exclusively by Plaintiffs," and the NFL Photo Store's website (nflphotostore.nfl.com) is contained within the NFL's own site. J.A. 127, 131. Moreover, the agreement between Replay and AP envisions that the NFL will be involved in the design of the online store, and gives the NFL "quality control approval" rights over the NFL Photo Store and the products sold therein. C.J.A. 16.

We decline to affirm dismissal of the secondary liability claim relating to Replay on the formalistic ground that the NFL asserts, and, in light of the allegations and supporting documentation noted above, we conclude that the complaint contains sufficient allegations to allow that claim to survive a motion to dismiss.

Second, Plaintiffs argue that the NFL is liable for secondary infringement for "encouraging and facilitating unlicensed copying and distribution of

36

Plaintiffs' photos by visitors to [NFL] websites." Appellants' Br. 58. But Plaintiffs do not allege any instances in which visitors to NFL websites violated Plaintiffs' copyrights — for example, by publishing one of Plaintiffs' photographs on another website — and without any allegation of direct infringement, there is nothing for which to hold the NFL secondarily liable. Dismissal of this particular claim of secondary infringement was proper.

Third, Plaintiffs argue that the NFL is liable for the removal of copyright management information ("CMI"). *See* 17 U.S.C. § 1202(b). The complaint contains only passing reference to CMI, alleging that NFL.com photo galleries allow visitors to "access large resolution copies of Plaintiffs' photos without appropriate copyright management information" and that the NFL "has removed the copyright management information from Plaintiffs' photos." J.A. 129. The complaint does not actually identify any instance in which CMI was removed or even make clear what specific type of CMI is at issue. The portion of the complaint that mentions CMI refers to an exhibit that includes NFL.com screenshots, and one photograph therein is attributed only to AP, not an individual photographer. But the complaint does not allege that the depicted photograph originally contained, say, a gutter credit with an author name, let

37

alone who the author is (or even whether he is one of the Plaintiffs). Nor do Plaintiffs describe the information removed from Plaintiffs' photographs elsewhere in the complaint either. The conclusory allegation to the effect of "CMI was removed" will not suffice. Dismissal of Plaintiffs' CMI claim should therefore be affirmed.

Finally, Plaintiffs argue that the NFL had no license to use Plaintiffs' photographs after March 31, 2015, when the 2012 AP-NFL agreement expired by its own terms. Defendants' only response is that "before that expiration, AP and the NFL entered into the Interim Agreement, which incorporates the terms (including AP's sublicense to the NFL) of" the 2012 agreement. AP Br. 39. Our determination that Plaintiffs have adequately alleged that the contributor agreements do not permit such a license moots Defendants' response, and for the reasons discussed above, Plaintiffs' infringement claims against the NFL and AP relating to the NFL's post-March 2015 uses should not have been dismissed.

## II. Alternative Contract and Tort Theories of Liability

Plaintiffs next argue that the district court was wrong to dismiss a series of claims that would be viable alternatives should it be determined on summary judgment or by a jury that the express terms of the contributor agreements do not

prohibit AP from granting complimentary licenses. We agree that Plaintiffs have stated a claim for breach of the implied covenant of good faith and fair dealing and fraud, but concur in the district court's dismissal of Plaintiffs' claims for breach of fiduciary duty and unconscionability.

## A.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs first contend that even if the contributor agreements do not expressly prohibit granting complimentary licenses, they have plausibly alleged that AP breached the implied covenant of good faith and fair dealing in doing so.

Under New York law, "implicit in every contract is a covenant of good faith and fair dealing . . . which encompasses any promises that a reasonable promisee would understand to be included." *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995) (internal citation omitted). "[N]either party to a contract shall do anything [that] has the effect of destroying or injuring the right of the other party to receive the fruits of the contract," or to violate the party's "presumed intentions or reasonable expectations." *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (citations omitted). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act

39

arbitrarily or irrationally in exercising that discretion." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (internal quotation marks omitted).

The allegations Plaintiffs make in support of their claim are significant. According to the complaint, AP secretly granted the NFL a license for complimentary and unfettered use of thousands of Plaintiffs' photographs, and in doing so sought (unsuccessfully) to excuse thousands of completed acts of copyright infringement. The going-forward license that the 2012 AP-NFL agreement contained deprived Plaintiffs of a significant revenue stream, yet implicitly yielded financial benefit for AP — albeit not on a per-image basis.

On those facts, Plaintiffs have plausibly alleged that AP deprived Plaintiffs of "the fruits of" the contributor agreements, *Fishoff*, 634 F.3d at 653, and we have little difficulty holding that the complaint adequately asserts that the agreements, if not expressly, at least implicitly prohibit AP from licensing or selling Plaintiffs' photographs in a way that benefits AP, but yields little to no value for Plaintiffs. Because Plaintiffs have plausibly alleged that the complimentary license does exactly that, Plaintiffs have stated a claim for breach of the implied covenant of good faith and faith dealing.

AP has two responses. First, it argues that the district court properly dismissed the breach of the implied covenant claim as duplicative, noting that New York law "'does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.'" AP Br. 54, quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). But AP takes the notion of duplicative claims too far. As *Harris* itself recognized, "parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." 310 F.3d at 80 (internal quotation marks omitted). A party certainly cannot succeed on claims for both breach of an express contract term and breach of the implied covenant based on the same facts, but where, as here, there is a dispute over the meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types of claims in the alternative. *Cf. Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 263 (2d Cir. 1999) (plaintiff may seek damages on alternative — and "mutually exclusive" — theories of breach of contract and *quantum meruit* where "there is a dispute over the existence, scope, or enforceability of the putative contract").

Second, AP argues that "the implied covenant cannot be used to impose a contractual duty on a party that would be inconsistent with a right the party holds under the express terms of the contract." AP Br. 54. As with the concept of duplicative claim, AP understands the notion of "inconsistent" duties too broadly. It cannot be that anytime a contract is silent on a specific right, implying a term limiting that hypothetical right is inconsistent with the "express terms of the contract." If that were the case, the very concept of implied terms would collapse. Instead, we must ask whether a proposed implied term defeats a right that a party actually bargained for — in other words, whether the implied term that might preserve the fruits of the contract for one party spoils the fruits for another.

Here, the contributor agreements do not explicitly state that AP has the right to give Plaintiffs' photographs away for free. Rather, one section of the agreements describes a broad license granted to AP; the following section attempts to account for the scenarios in which Plaintiffs get paid for sublicenses and explicitly identifies the scenarios where AP can use or license contributor photographs without triggering a royalty obligation. And in general, a principal (and obvious) aim of the agreements is for AP to license Plaintiffs' photographs

42

and earn royalties for both AP and Plaintiffs in return. We thus reject the

argument that by limiting AP's ability to structure its sublicenses so as to receive

benefits itself, but evade the payment obligations triggered by "a la carte" or

"bulk rate" sales, J.A. 923–24, a court would be implying a term that is

inconsistent with AP's express rights under the contract.

The cases on which AP relies do nothing to undermine our conclusion.[9]

Accordingly, we conclude that the district court erred in dismissing Plaintiffs'

claims for breach of the implied covenant of good faith and fair dealing.

---

[9] In *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, the defendant, a struggling company that owed tens of millions of dollars to the plaintiff bank, claimed that the bank had breached the implied covenant of good faith and fair dealing when it refused to consent to a sale of certain of the defendant's assets. 374 F.3d 158, 168 (2d Cir. 2004). But the agreement between the parties expressly gave the bank unrestricted approval rights for such sales, and the conditions the bank sought to put on the sale — that the defendant pay $87 million from the proceeds of the sale in partial repayment of its debt, and that the defendant provide the bank with new collateral and economic benefits — can hardly be said to have destroyed the fruits that the defendant company was to enjoy under the contract. *Id.* at 168–69.

*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.* concerned a long-running dispute over the trademark "Field & Stream," which the defendant used in connection with outdoor apparel and products, and the plaintiff used in the title of a magazine and for products carrying that magazine's branding. 294 F.3d 383, 384–89 (2d Cir. 2002). The parties had agreed that each party would have the exclusive right to use the trademark in connection with specific products, and "allowed the party that first used or licensed the mark in connection with a [new] class of goods an exclusive right to the mark for that class." *Id.* at 387. The plaintiff sued the defendant, claiming that the defendant had breached the implied covenant of good faith and fair dealing by entering into purportedly "sham" license agreements. *Id.* at 388. We affirmed a grant of summary judgment for the defendant, holding that because the agreement "clearly set forth the parties' respective rights" with respect to new products, and included a procedure to test a party's good faith, the plaintiff could not "avoid the express terms of the contract by relying on the implied covenant of good faith and fair dealing." *Id.* at 395. No such clear contractual test of good faith is present here.

44

**B.      Breach of Fiduciary Duty**

Plaintiffs allege that AP also violated a fiduciary duty to Plaintiffs by granting the NFL complimentary access to their photographs. The district court correctly dismissed that claim.

To state a breach of fiduciary duty claim under New York law, a plaintiff must plead: "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011). "A fiduciary relationship exists under New York law when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 599 (2d Cir. 1991) (internal quotation marks omitted). Typically, "when parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *In re Mid–Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) (internal quotation marks and brackets omitted).

Here, not only do the relationships between Plaintiffs and AP arise from arm's-length agreements, but those agreements expressly state that "[n]either the

45

making of this Agreement nor the performance of its provisions shall be construed to constitute either Party an agent, partner, joint venture, employee or legal representative of the other Party." J.A. 920. We have previously held that a breach of fiduciary duty claim fails where the governing agreement makes "clear that [the defendants] were not to be held to the ordinary standard of care applicable to fiduciaries." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998); *see also LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 523 (S.D.N.Y. 2014) ("[N]o fiduciary duty is owed where explicit contractual disclaimers of fiduciary duty apply."). Although the disclaimer in the contributor agreements does not use the word "fiduciary," it does disavow the very types of contractual relationships that might create a fiduciary duty between parties to an arm's-length commercial agreement. *See, e.g.*, *Argilus, LLC v. PNC Fin. Servs. Grp., Inc.*, 419 F. App'x 115, 119 (2d Cir. 2011) ("Under New York law, participants in a joint venture owe one another the same fiduciary duties that inhere between members of a partnership."); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir. 1983) ("There is no doubt but that the relationship between Harrison and [his business manager] prior to the termination of the management agreement . . . was that of principal and agent, and that the relationship was fiduciary in

46

nature"). Given the disclaimer, as well as the arm's-length nature of Plaintiffs' relationship with AP, Plaintiffs have failed to allege the requisite fiduciary relationship, and their breach of fiduciary duty claims were properly dismissed.

## C.    Unconscionability

Plaintiffs next contend that, should the contributory agreements be deemed to allow AP to issue complimentary licenses, the agreements are unconscionable and thus voidable.

"The doctrine of unconscionability seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties." *United States v. Martinez*, 151 F.3d 68, 74 (2d Cir. 1998) (internal quotation marks omitted). In general, a provision will be deemed unenforceable on unconscionability grounds only where it is "both procedurally and substantively unconscionable when made." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988). In other words, "[a] contract or clause is unconscionable when there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 122 (2d Cir. 2010) (quoting *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F.Supp.2d 566, 571

(S.D.N.Y.2009)).

The district court initially held that the contributor agreements were unconscionable, but on reconsideration decided to dismiss Plaintiffs' unconscionability claims on the ground that Plaintiffs had ratified their contributor agreements. We agree with that determination. Under New York law, a party can ratify an unconscionable agreement, *King v. Fox*, 458 F.3d 39, 40 (2d Cir. 2006); *see also Lawrence v. Graubard Miller*, 11 N.Y.3d 588, 595 n.3 (2008), and does so by accepting benefits under the agreement with knowledge of its terms instead of promptly repudiating it, *see King v. Fox*, 418 F.3d 121, 132 (2d Cir. 2005); *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122–23 (2d Cir. 2001).

Here, until at least the time that Plaintiffs filed their operative complaint in August 2015, Plaintiffs performed under the contributor agreements and accepted the benefits that flowed from that performance. Plaintiffs, five of whom waited more than four years before initiating this lawsuit, do not allege that they have returned any of the benefits obtained under the agreements.[10]

---

[10] Plaintiffs claim that two of the photographers, Witte and Stulka, stopped providing photographs to AP upon commencement of this suit in 2013. Although the declarations cited in support of that claim instead suggest that Stulka actually stopped shooting NFL events in 2015, the fact remains that neither Plaintiff disclaims having continued to receive royalties for photographs that Plaintiffs

Plaintiffs' principal response is that they were under continuing duress and thus had no opportunity (or obligation) to rescind the contributor agreements. *Cf. Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 133 (1971) (rejecting claim that a party had ratified contract originally entered into under duress where the party reasonably feared "further business compulsion" by the counterparty). However, mere "financial pressure or unequal bargaining power" does not constitute duress. *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011). Instead, the law "demands threatening conduct that is 'wrongful,' *i.e.*, outside a party's legal rights." *Id.*

Plaintiffs fail to allege such wrongful conduct. They claim that AP "forced Plaintiffs to accept its terms or forgo *any* commercial licensing of any NFL-related photos, past or present." Appellants' Reply Br. 27. But that is just another way of saying that AP used its position as the licensing agent for the NFL's intellectual property — for which Plaintiffs themselves needed a license so that their photographs could be available for commercial use — to drive a hard bargain. Sports photographers do not have a general right to the NFL's intellectual property, and it was within AP's legal rights as the NFL's licensing agent to

had already licensed to AP and that AP still sublicenses to third parties.

49

threaten to withhold access to that intellectual property in negotiating the terms of the contributor agreements. *See Interpharm, Inc.*, 655 F.3d at 142 (recognizing that "a threat to exercise a legal right" cannot constitute a wrongful threat).

For these reasons, Plaintiffs' unconscionability claims were properly dismissed.

### D. Fraud

Finally, Plaintiff contend that they have stated a claim for fraud on the theory that AP falsely told Plaintiffs that it would not grant the NFL complimentary access to their photographs in order to induce Plaintiffs to leave Getty and sign contributor agreements with AP.

Proof of fraud under New York law requires a showing that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415–16 (2d Cir. 2006) (internal quotation marks omitted). Misrepresentations made to induce a party to enter a contract are not actionable as fraud, however, unless they are "collateral" to the contract induced. *Id.* at 416; *see Deerfield Comms. Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d

954, 956 (1986) (holding that a false promise to not resell goods outside a specific geographical area "constitute[d] a misrepresentation" for purposes of fraud where geographical restrictions were not contained in the written agreement for the purchase of those goods). Where a plaintiff alleges, by contrast, that the defendant simply misrepresented its intent to perform under a contract, no separate claim for fraud will lie, and the plaintiff must instead bring an action for breach of contract. *Wall*, 471 F.3d at 416.

That rule extends to the implied terms of the contract. *See N.Y. Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 318 (1995). In *New York University*, for example, the plaintiff claimed that the defendants had fraudulently induced it to take out an insurance policy by "misrepresent[ing] the integrity of their company." *Id.* The New York Court of Appeals rejected that claim. It reasoned that because the implied covenant of good faith and fair dealing included the defendants' obligation "to investigate in good faith and pay covered claims," the general allegations relating to company integrity concerned no more than the defendants' intention to perform under the contract, including "any covenants implied,"and thus the plaintiff's claim was not separately actionable under a theory of fraud. *Id.*

If Plaintiffs prevail on either the theory that the express terms of the contributor agreements barred complimentary licenses or the theory that the agreements' implied covenant of good faith and fair dealing prohibited AP's give-away of Plaintiffs' photographs, Plaintiffs' claims for fraud will necessarily fail: if either theory succeeds, AP will, at most, have done nothing more than falsely promise to abide by the terms of the contributor agreements. But should it ultimately be determined that neither the express nor the implied terms of the agreements prohibit what AP is alleged to have done, a separate claim for fraud may still lie.

AP offers three reasons why, even in that alternative scenario, Plaintiffs nevertheless fail to state a claim for fraud.[11]

First, AP argues that Plaintiffs allege nothing more than a statement of future intent. Although a "mere promissory statement as to what will be done in the future" does not constitute a material misrepresentation of fact, a promise

---

[11] AP also argues that dismissal of Plaintiffs' fraud claims is warranted for the same reasons as Plaintiffs' unconscionability claims. But a plaintiff need not renounce a contract to bring a fraud claim for damages, *see Deerfield Commc'ns Corp.*, 68 N.Y.2d at 956 (upholding damage award on claims of breach of contract *and* fraudulent inducement of that contract), and it is dismissal of their fraud claims for damages that Plaintiffs are appealing here.

"made with a preconceived and undisclosed intention of not performing it" does.

*Deerfield Commc'ns Corp.*, 68 N.Y.2d at 956. Here, Plaintiffs allege that when AP's representative told Plaintiffs that AP "would not grant the NFL complimentary use of Plaintiffs' photographs," the representative "knew at the time that AP intended to permit the NFL unrestricted access to Plaintiffs' photos and that it did not intend to prohibit the NFL from copying and using Plaintiffs' photos without paying for a license." J.A. 143. Moreover, Plaintiffs allege that by the time AP made its representation, the NFL was already using other contributors' photographs in the same way it ultimately used Plaintiffs'. In light of those allegations, as well as AP's allegedly deceptive response to the concerns Plaintiffs raised about infringement by the NFL in 2012, it is certainly plausible that AP never intended to keep its promise that it would not give Plaintiffs' photographs to the NFL for free.

Second, AP argues that Plaintiffs could not have reasonably relied on pre-contract statements that AP would not grant complimentary licenses because the "unambiguous terms" of the contributor agreements "permitted AP to issue royalty-free sublicenses to the NFL." AP Br. 49. As we have already determined, the terms of those agreements are certainly not unambiguous. Even if they were,

53

the fact that a party is permitted to take a certain action does not necessarily make it unreasonable to rely on that party's extracontractual promise to nevertheless refrain from doing so. If AP's proposition were true, a fraud claim based on a false promise made in contract negotiations could never succeed: such a claim is available only where the promise is collateral to the contract, meaning the alleged fraud will *always* concern an action that was not prohibited by the contract itself. *See, e.g.*, *Deerfield Commn'cs Corp.*, 68 N.Y.2d at 956 (upholding fraud claim concerning promise to restrict sales to certain geographic area where contract included no such restrictions). Here, the complaint alleges that AP told Plaintiffs that its agreement with the NFL did not require complimentary licenses and, further, that it was financially necessary to charge the NFL for licenses for Plaintiffs' works in order to "offset the complimentary use of AP's wholly-owned photos that AP already had agreed to." J.A. 113. In light of those allegations, we do not think that it was unreasonable as a matter of law for Plaintiffs to rely on AP's representation that it would not grant the NFL complimentary licenses.

Finally, AP argues that Plaintiffs fail to allege any damages that are separate and apart from those suffered as a result of AP's alleged breach of contract. Because Plaintiffs' fraud claim will come into play only if it is

determined that AP did not violate the express and implied terms of the contributor agreements, Plaintiffs' recovery on their fraud claim will not (and could not) duplicate damages resulting from AP's violation of the contributor agreements' terms. Moreover, Plaintiffs do allege damages that are distinct from the damages that they could recover for breach of contract and, instead, represent the "loss suffered through th[e] inducement." *Deerfield Commn'cs Corp.*, 68 N.Y.2d at 956. For instance, Plaintiffs allege that, relying on AP's misrepresentations, they "terminate[d] their agreements with Getty Images thus causing [them] to lose substantial revenue from licensing opportunities related to their non-NFL content," which they were required to remove from Getty's image library. J.A. 145. We have upheld fraud claims in similar circumstances. *See, e,g., Stewart v. Jackson & Nash*, 976 F.2d 86, 87–88 (2d Cir. 1992) (dismissal of fraud claim improper where plaintiff alleged she was fraudulently induced to leave her previous employer and sign employment contract with new firm, allegedly causing her loss of professional opportunity, loss of professional reputation, and damage to career growth and potential).

We are thus unpersuaded by AP's arguments and conclude that the district court erred in holding that Plaintiffs had failed to state a claim for fraud.

## III.    Antitrust Violations

Finally, Plaintiffs contend that they alleged a plausible antitrust conspiracy involving the NFL and AP in the "market for commercial licensing of [NFL]-related stock photography." J.A. 133. Specifically, Plaintiffs allege that the NFL and the NFL teams, by pooling and collectively licensing their intellectual property, formed a horizontal conspiracy, which they operate in conjunction with AP as their exclusive licensing agent in order to "control the commercial market for professional football-related stock photography." J.A. 135.

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1; *see id.* § 3 (extending same prohibition to U.S. territories and District of Columbia). Because the NFL's decision to jointly license its intellectual property is not per se illegal, Plaintiffs' claims are subject to a rule of reason analysis, which requires antitrust plaintiffs to "demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 315 (2d Cir. 2008) (internal quotation marks omitted); *see Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196–204 (2010) (remanding for

consideration of whether the NFL's decision to collectively license intellectual property was justified under the rule of reason); *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 100–04 (1984) (applying rule of reason to assess NCAA restrictions on college football broadcasts). Under the rule of reason, plaintiffs "bear[] the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993).

Plaintiffs' allegations of anticompetitive effect here are insufficient. First, Plaintiffs allege that the conspiracy "has substantially reduced the output of stock photography for NFL events." J.A. 140. But an antitrust plaintiff must allege an adverse effect "in the relevant market," *Capital Imaging*, 996 F.2d at 543, and the relevant market, as Plaintiffs define it, is the market for *commercial licenses* of NFL event photographs. Even if Plaintiffs plausibly allege that fewer credentials are being given for particular NFL events and thus fewer photographs are being taken of those events, those allegations say nothing about the market for licenses for such photographs because, among other reasons, the pool of photographers, no matter its size, still captures the entirety of each event, and multiple

commercial licenses can attach to each photograph taken. Without a match between the injury alleged and the market described, Plaintiffs' "reduced output" allegation is insufficient to show an anticompetitive effect on the commercial licensing of NFL event photographs.

Second, Plaintiffs allege that "[b]ecause of the Defendants' influence on and control over this market, the aggregate cost to consumers [of commercial licenses] has increased."[12] J.A. 140. But they cite no examples, data, or other facts to support their assertion, and a conclusory allegation that prices have increased will not suffice to state anticompetitive effect. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Plaintiffs' only stab at specificity relates to alleged black market sales of Plaintiffs' photographs in Wisconsin. They claim that "Plaintiffs Boehm and Stluka have been forced to file two separate lawsuits against nearly 30 different

---

[12] It is not entirely clear that an antitrust conspiracy that raised prices for consumers of commercial licenses for NFL event photographs would necessarily hurt suppliers of those photographs like Plaintiffs. Pursuant to the parties' agreements, any increased revenue from such licenses would be divided among AP, the NFL, and the contributing photographer. Plaintiffs are certainly dissatisfied with how that pie is divided, but their dissatisfaction would seem to stem not from anticompetitive behavior in the market for commercial licenses for NFL event photographs, but from potentially anticompetitive behavior in the market for licenses for NFL's own trademarks.

Wisconsin sports memorabilia dealers and retailers related to the illegal use of their photos to create sports memorabilia, canvases, posters, and other products," and posit that the fact that "these retailers are even willing to risk the stiff damages for copyright infringement demonstrates the lengths that the relevant market consumers now are forced to go to avoid paying the licensing fees demanded by AP and the NFL." J.A. 140–41. The identification of two copyright lawsuits, in one state, however, does not suffice to permit a plausible inference that Defendants' alleged anticompetitive behavior increased prices in the market for commercial licenses for NFL photographs "as a whole." *Capital Imaging*, 996 F.2d at 543. Copyright infringement is a common problem even in competitive markets, and it is too speculative to infer, based on the specific instances of the infringement alleged in Plaintiffs' other suits, that Defendants' anticompetitive behavior has improperly caused the cost of commercial licenses to increase.

We do not suggest that the nature of professional sports makes the NFL immune from antitrust scrutiny, and it is possible that other photographers in Plaintiffs' position might frame their claims differently — for example, by alleging anticompetitive behavior in the market for commercial licenses for *NFL trademarks*, of which sports photographers are consumers, a fact that makes those

59

photographers well positioned to allege actual changes in costs over time. But we must assess Plaintiffs' allegations vis-à-vis the market Plaintiffs define, and Plaintiffs do not plausibly allege an adverse effect on competition in the market for commercial licenses for NFL event photographs. For this reason, Plaintiffs have failed to state an antitrust claim, and the district court was right to dismiss their assertion of such a claim.

## CONCLUSION

For the foregoing reasons, we VACATE those portions of the district court's judgment that dismiss (i) Plaintiffs' claims for copyright infringement against AP and the NFL relating to the NFL's uses of Plaintiffs' photographs from 2009 to present, (ii) Plaintiffs' claims for copyright infringement against AP, the NFL, and Replay relating to uses of Plaintiffs' photographs in connection with the Replay Photo Store, (iii) Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing against AP, and (iv) Plaintiffs claims for fraud against AP. We AFFIRM the judgment in all other respects, and REMAND for further proceedings consistent with this opinion.